**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
DAVID PATCHAK,                                      )
                                                    )
                    Plaintiff,                       )
                                                    )
        vs.                                          )
                                                    )
DIRK KEMPTHORNE, in his official capacity            )        Case No. 1:08-CV-01331
as SECRETARY OF THE UNITED STATES                    )        Hon. Richard J. Leon
DEPARTMENT OF THE INTERIOR,                          )
                                                    )
and                                                  )
                                                    )
CARL J. ARTMAN, in his official capacity as          )
ASSISTANT SECRETARY OF THE UNITED                    )
STATES DEPARTMENT OF THE INTERIOR,                   )
BUREAU OF INDIAN AFFAIRS,                            )
                                                    )
                    Defendants.                      )
_____)
                                                    )
MATCH-E-BE-NASH-SHE-WISH BAND OF                     )
POTTAWATOMI INDIANS, a federally                     )
recognized Indian Tribe,                             )
                                                    )
                    Intervenor.                      )
_____)

<u>**UNOPPOSED MOTION TO INTERVENE PURSUANT TO FED. R. CIV. P. 24(B)**</u>

The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians ("Tribe"), a federally-recognized Indian Tribe, submits this unopposed motion to intervene as a defendant pursuant to Federal Rule of Civil Procedure 24(b). The undersigned contacted counsel for Plaintiff and for Defendants, who respectively stated that neither Plaintiff nor Defendants will oppose the motion.

The Tribe understands that Plaintiff intends to move for injunctive relief from this Court. Thus, for the reasons set forth in the attached Statement of Points and Authorities, the Tribe

respectfully requests that the Court promptly grant this motion, permit the Tribe to intervene as a defendant, and direct the clerk to file the Tribe's Answer.

Respectfully submitted this 19th day of August, 2008.

        Match-E-Be-Nash-She-Wish Band of
        Pottawatomi Indians, Intervenor-Defendant,

By    /s/ Conly J. Schulte             
        Conly J. Schulte
        Shilee T. Mullin
        FREDERICKS PEEBLES & MORGAN LLP
        3610 North 163rd Plaza
        Omaha, NE 68116
        Telephone (402) 333-4053
        Fax (402) 333-4761

        Seth P. Waxman
        Edward C. DuMont
        Demian S. Ahn
        WILMER CUTLER PICKERING
          HALE AND DORR LLP
        1875 Pennsylvania Avenue NW
        Washington, DC 20006
        Telephone (202) 663-6910
        Fax (202) 663-6363

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2008, a copy of the foregoing Unopposed Motion To Intervene Pursuant To Fed. R. Civ. P. 24(B) was served by first class mail on the parties below, and was filed electronically with the Clerk of the Court. The electronic filing prompted automatic service of the filing to all counsel of record in this case who have obtained CM/ECF passwords. The following parties were additionally served by first class mail:

Tobey B. Marzouk
MARZOUK & PARRY
1120 Nineteenth Street, N.W., Suite 750
Washington, DC  20036
Counsel for Plaintiff

Bruce A. Courtade
Gregory G. Timmer
RHOADES MCKEE
161 Ottawa Ave. N.W., Ste. 600
Grand Rapids, MI  49503
Counsel for Plaintiff

Gina L. Allery
U.S. Department of Justice
Environment & Natural Resources Div.
Indian Resources Section
P.O. Box 44378
Washington, D.C. 20026-4378

                /s/ Conly J. Schulte

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————————————— ) | |
| DAVID PATCHAK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| DIRK KEMPTHORNE, in his official capacity ) | Case No. 1:08-CV-01331 |
| as SECRETARY OF THE UNITED STATES ) | Hon. Richard J. Leon |
| DEPARTMENT OF THE INTERIOR, ) | |
| ) | |
| and ) | |
| ) | |
| CARL J. ARTMAN, in his official capacity as ) | |
| ASSISTANT SECRETARY OF THE UNITED ) | |
| STATES DEPARTMENT OF THE INTERIOR, ) | |
| BUREAU OF INDIAN AFFAIRS, ) | |
| ) | |
| Defendants. ) | |
| ———————————————————————— ) | |
| ) | |
| MATCH-E-BE-NASH-SHE-WISH BAND OF ) | |
| POTTAWATOMI INDIANS, a federally ) | |
| recognized Indian Tribe, ) | |
| ) | |
| Intervenor. ) | |
| ———————————————————————— ) | |

<u>**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF THE TRIBE'S**</u>
<u>**UNOPPOSED MOTION TO INTERVENE PURSUANT TO FED. R. CIV. P. 24(B)**</u>

The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (the "Tribe" or "Gun Lake Tribe") submits this Statement of Points and Authorities in Support of the Tribe's Unopposed Motion to Intervene Pursuant to Fed. R. Civ. P. 24(b).[1]

For the reasons set forth below, and in light of the Tribe's understanding that Plaintiff intends to move for injunctive relief, the Tribe respectfully requests that the Court promptly

---

[1] While we believe the Tribe is entitled to intervene as of right under Fed. R. Civ. P. 24(a), we submit this unopposed motion for permissive intervention under Fed. R. Civ. P. 24(b).

grant the Motion, permit the Tribe to intervene as a defendant, and direct the Clerk of the Court to file the Tribe's Answer.

## PROCEDURAL BACKGROUND

The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians is a federally-recognized Indian Tribe that has not had any reservation or other federally-protected land for over 170 years. Declaration of Chairman David K. Sprague in Support of Motion to Intervene ("Sprague Decl.") ¶ 5. In order to remedy that injustice and achieve economic self-sufficiency through a proposed gaming facility, the Tribe secured a small parcel of land within its aboriginal territory and—nearly seven years ago—asked the Secretary of the Interior to accept the land into trust for the benefit of the Tribe. *Id.* ¶¶ 6, 10. The Secretary published his final decision to accept the land into trust on May 13, 2005. *Id.* ¶ 14.

Shortly thereafter (but now more than three years ago), an organization named Michigan Gambling Opposition ("MichGO") filed in this Court a complaint challenging the Secretary's decision on various statutory and constitutional grounds (although not including the claim Plaintiff presents here). *Id.* ¶ 15. The Plaintiff in this case, David Patchak, publicly supported that litigation and is a member of or affiliated with MichGO. *Id.* ¶¶ 17-22. Plaintiff, however, did not intervene or take any other legal action in his individual capacity, even when MichGO's claims were rejected by this Court, 477 F. Supp. 2d 1 (D.D.C. 2007), and the Court of Appeals, 525 F.3d 23 (D.C. Cir. 2008), and even when MichGO belatedly attempted to raise the very legal claim on which Plaintiff now relies (MichGO Mot. To Supplement Issues, filed March 7, 2008, in *Michigan Gambling Opposition v. Kempthorne*, U.S. Court of Appeals for the D.C. Circuit,

Case No. 07-5092). *See* Sprague Decl. ¶ 16. Indeed, Plaintiff took no action until August 1, 2008, seven days *after* the D.C. Circuit denied MichGO's petition for rehearing *en banc*.[2]

Meanwhile, the Tribe promptly moved to intervene in the MichGO litigation on July 27, 2005. Sprague Decl. ¶ 15. The Court granted the Tribe's motion in light of the Tribe's "interest defending [the Secretary's] decision to place the 147-acre parcel of land into trust," holding that the Tribe "should be granted permissive intervention pursuant to Fed. R. Civ. P. 24(b)." Memorandum Opinion dated September 1, 2005, at 5 (Dkt. 18), *Michigan Gambling Opposition v. Norton*, U.S. District Court for the District of Columbia Civil Action No. 05-01181 (JGP). This motion requests that the Court similarly grant the Tribe's motion to intervene in this case.

## STATEMENT IN SUPPORT OF THE UNOPPOSED MOTION

This litigation is a transparent attempt, by those who oppose the Tribe's application for trust lands, to get a second bite at the apple. Plaintiff's Complaint challenges the same decision by the Secretary of the Interior, concerns the same land, presents some of the same issues, and in light of Plaintiff's connections with MichGO, appears to involve the same parties as the MichGO case. The Tribe's motion to intervene should therefore be granted for the same reasons that the Tribe was entitled to intervene in *MichGO*:

*First*, the Tribe meets the standard for permissive intervention because its intended "defense" will present "a question of law or fact in common" with the questions presented by "the main action." Fed. R. Civ. P. 24(b)(2); *Appleton v. Food and Drug Admin.*, 310 F. Supp. 2d

---

[2] It thus appears, under the circumstances and based on the allegations in his Complaint (¶¶ 11-12), that Plaintiff simply decided to do nothing until it was clear that MichGO's claims would (finally) be denied. On August 15, 2008, the D.C. Circuit in the *MichGO* case stayed its mandate pending MichGO's petition for a writ of certiorari.

194, 196 (D.D.C. 2004). In fact, because the Tribe seeks to defend every claim Plaintiff asserts, the matters of law and fact the Tribe will address are identical to those already before the Court.

*Second*, the Tribe's motion to intervene was timely filed and will not "unduly delay or prejudice the adjudication of the rights of the original parties." Fed. R. Civ. P. 24(b)(3). The Tribe's motion was filed less than twenty days after the Complaint, before Defendants were required to file any responsive pleadings. Moreover, as explained further below, the Tribe has every incentive to expedite the proceedings and will not delay the litigation in any manner.

*Third*, this litigation directly threatens the Tribe's vital governmental, social and economic interests in acquiring federally-protected trust lands and obtaining other federal benefits—and no other party can sufficiently represent the Tribe's unique sovereign interests. Indeed, Indian tribes are routinely allowed to intervene in cases where a plaintiff challenges the Secretary's decision to accept a parcel of land into trust for the benefit of the Tribe, as illustrated in *Florida Dep't of Bus. Regulation v. Dep't of Interior*, 768 F.2d 1248, 1250 (11th Cir. 1985), *Roseville v. Norton*, 219 F. Supp. 2d 130, 137 (D.D.C. 2002), *City of Sault Ste. Marie, Michigan v. Andrus*, 532 F.Supp. 157, 159-60 (D.D.C. 1980), and of course in the MichGO litigation.

In this case, its lack of federal trust lands—an injustice that has been perpetuated for more than 170 years—has not only denied the Tribe a land base where it can exercise territorial jurisdiction and fulfill the promise of a "government-to-government relationship with the United States," 25 C.F.R. § 83.12, but it has also deprived the Tribe of the means to pursue economic self-sufficiency. Sprague Decl. ¶¶ 5, 23-30. Like any government, the Tribe seeks to provide enhanced opportunities and a better life for its members and future generations. *Id*. ¶¶ 26-27. But unlike many governments, the Tribe lacks the resources to provide even basic social programs or

4

other assistance to its members—and as a result the Tribe disproportionately suffers from unemployment, low homeownership rates, and other diminished economic opportunities.[3] *Id.*

The proposed trust acquisition, which will allow the Tribe to proceed with its proposed gaming facility pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701, *et seq.*, is the only practical means for the Tribe to attain economic self-sufficiency and tribal self-determination. Sprague Decl. ¶ 26. The casino will provide jobs for its members and funds for a number of critical social programs, including rental housing assistance, emergency assistance, health care, home buying assistance, youth programs, higher education programs, and elder care. *Id.* ¶¶ 31-33. These benefits, which Congress specifically contemplated when it enacted the IGRA, will remain unattainable so long as the Tribe lacks any federal trust lands.

Finally, the impact of this litigation could extend beyond the particular trust acquisition that prompted Plaintiff's Complaint. Plaintiff's claim that the Tribe is not an "Indian Tribe" covered by Section 19 of the IRA could deprive the Tribe of the right to obtain federal trust lands under other circumstances—and it could deny the Tribe other important benefits that, under the IRA and similar statutes, are limited to Tribes with land in trust. *See* 25 U.S.C. § 461, *et seq.*; 26 U.S.C. § 168(j); 26 U.S.C. § 45A; 26 U.S.C. § 7871(c)(3); 25 U.S.C. §§ 1521, *et seq.*[4]

---

[3]  Indeed, as of April 2005, the Tribe's unemployment rate was approximately 27%, which is six times higher than that of non-Tribal members in the surrounding area for the time period. Sprague Decl. ¶ 29. Similarly, whereas the home ownership rate in surrounding areas is approximately 83%, only 26% of Tribal Members own their own residence. *Id.*

[4]  While Federal Government Defendants have proficient counsel and will no doubt be mindful of the Tribe's interests set forth above, the nature of this action is such that the United States government cannot fully represent the Tribe's sovereign interests. For example, while time is of the essence for the Tribe—the significant costs resulting from any further delay will be most directly, and in some cases exclusively, borne by the Tribe—the United States on several occasions during the MichGO litigation voluntarily agreed to delay accepting the land into trust over the Tribe's objections and, most recently in this case, granted yet another self-stay without consulting with or informing the Tribe. Sprague Decl. ¶ 32.

## CONCLUSION

For the foregoing reasons, the Court should grant the Tribe's Unopposed Motion to Intervene Pursuant to Fed. R. Civ. P. 24(b).

Respectfully submitted this 19th day of August.

<div style="margin-left:40%">

Match-E-Be-Nash-She-Wish Band of
Pottawatomi Indians, Intervenor-Defendant,

By     /s/ Conly J. Schulte
    Conly J. Schulte
    Shilee T. Mullin
    FREDERICKS PEEBLES & MORGAN LLP
    3610 North 163rd Plaza
    Omaha, NE 68116
    Telephone (402) 333-4053
    Fax (402) 333-4761

    Seth P. Waxman
    Edward C. DuMont
    Demian S. Ahn
    WILMER CUTLER PICKERING
     HALE AND DORR LLP
    1875 Pennsylvania Avenue NW
    Washington, DC 20006
    Telephone (202) 663-6910
    Fax (202) 663-6363

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2008, a copy of the foregoing UNOPPOSED MOTION TO INTERVENE PURSUANT TO FED. R. CIV. P. 24(B) was served by first class mail on the parties below, and was filed electronically with the Clerk of the Court. The electronic filing prompted automatic service of the filing to all counsel of record in this case who have obtained CM/ECF passwords. The following parties were additionally served by first class mail:

Tobey B. Marzouk
MARZOUK & PARRY
1120 Nineteenth Street, N.W., Suite 750
Washington, DC  20036
Counsel for Plaintiff

Bruce A. Courtade
Gregory G. Timmer
RHOADES MCKEE
161 Ottawa Ave. N.W., Ste. 600
Grand Rapids, MI  49503
Counsel for Plaintiff

Gina L. Allery
U.S. Department of Justice
Environment & Natural Resources Div.
Indian Resources Section
P.O. Box 44378
Washington, D.C. 20026-4378

_____/s/ Conly J. Schulte_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID PATCHAK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| DIRK KEMPTHORNE, in his official capacity ) | Case No. 1:08-CV-01331 |
| as SECRETARY OF THE UNITED STATES ) | Hon. Richard J. Leon |
| DEPARTMENT OF THE INTERIOR, ) | |
| ) | |
| and ) | **DECLARATION OF CHAIRMAN** |
| ) | **DAVID K. SPRAGUE IN SUPPORT** |
| CARL J. ARTMAN, in his official capacity as ) | **OF UNOPPOSED MOTION TO** |
| ASSISTANT SECRETARY OF THE UNITED ) | **INTERVENE** |
| STATES DEPARTMENT OF THE INTERIOR, ) | |
| BUREAU OF INDIAN AFFAIRS, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| MATCH-E-BE-NASH-SHE-WISH BAND OF ) | |
| POTTAWATOMI INDIANS, a federally ) | |
| recognized Indian Tribe, ) | |
| ) | |
| Intervenor. ) | |
| ) | |

### Introduction

1.    The information contained herein is based upon my personal knowledge, and I am competent to testify to the matters herein if called to do so in any proceeding.

2.    I reside at 1642 Parker Drive, Wayland, Michigan 49348, and have resided there for seven years. My residence is about five miles from the 147-acre parcel at issue in this case.

3.    I am the duly elected Chairman of the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, a federally-recognized Indian tribe commonly known as the "Gun Lake Tribe" (hereinafter "Tribe" or "Gun Lake Tribe"). I have served in this capacity for fifteen years.

4.   In my capacity as Chairman, I am the primary representative of the Tribe and preside over the Tribe's governing body, the elected Tribal Council. As a member of the Tribe and as the Tribe's Chairman, I have knowledge of the Tribe's history.

### Historical Background

5.   While the Tribe has fought to regain the ability to exercise its sovereign right of territorial sovereignty ever since it was deprived of its land without its consent 170 years ago, the Tribe still does not have any reservation or trust lands. So long as it remains without trust lands, the Tribe will be unable to fully realize its rights as a federally-recognized Indian tribe. 25 C.F.R. § 83.12.

6.   In approximately 2001, the Tribe identified a 147-acre tract of land to acquire for the establishment of its gaming and entertainment facility. This land is comprised of two adjacent parcels totaling 147.48 acres. Both parcels are located in the Township of Wayland, County of Allegan in the State of Michigan. One of the parcels is commonly known as "1123 129th Avenue, Bradley, Michigan." Both parcels are collectively referred to as "the Bradley Tract."

7.   The Bradley Tract is located less than three miles from lands the Tribe has historically occupied. These lands are known as the "Griswold Colony." The Griswold Colony and the Bradley Tract are both located within the boundaries of the land ceded from the Tribe to the United States in the Treaty of Chicago of August 29, 1821.

8.   A majority of the Tribe's members have remained in the area to the present day. Most of the Tribe's Members live within ten to twenty-five miles of the Griswold Colony, which is less than three miles from the Bradley Tract.

9.    The Bradley Tract is currently zoned "light industrial" and contains an industrial building where Ampro Industries, Inc., once manufactured lawn products such as hydroseed mix and mulch. A true and correct depiction of the Bradley Tract is attached hereto as "Exhibit A."

**Procedural Background**

10.    On August 8, 2001, the Tribe requested that the Secretary of Interior accept the Bradley Tract into trust for the benefit of the Tribe. The Tribe also requested that the Secretary proclaim that the Bradley Tract is the Tribe's initial reservation for purposes of the Indian Gaming Regulatory Act, 25 U.S.C. § 2719(b)(1)(ii).

11.    During the lengthy administrative process that followed, hundreds of comments were received from the general public, local organizations, governments, and government officials (including supporters and opponents of the project).

12.    Many local governments and organizations have voiced their support for the project, including: Wayland Township; the City of Wayland; Allegan County Chamber of Commerce; Kalamazoo Regional Chamber of Commerce; Deputy Sheriff's Association of Michigan; Barry County Chamber of Commerce; Friends of Gun Lake Indians (an organization with over 10,000 members); Dorr Business Association; Hopkins Superintendent of Schools; Kalamazoo Convention and Visitors Bureau, along with many Kalamazoo Unions and organizations, to name a few.

13.    The Bureau of Indian Affairs ("BIA") issued a final Environmental Assessment ("EA") for the Bradley Tract in December 2003. The Secretary of the Interior issued a "Finding of No Significant Impact" ("FONSI") on February 27, 2004.

14.    The BIA published notice of the Secretary's final decision to accept the Bradley Tract into

trust on May 13, 2005. 70 Fed. Reg. 25,596. The notice provided interested parties with

thirty days from the date of the notice to appeal the decision. Id.

15.    On June 13, 2005, an anti-gambling organization called Michigan Gambling Opposition

("MichGO") filed a lawsuit against the above-captioned Defendants to halt the Secretary's

acceptance of the Bradley Tract into trust. The Tribe filed a motion to intervene in that

action on July 27, 2005, and the U.S. District Court for the District of Columbia granted the

Tribe's motion on September 1, 2005. On February 23, 2007, the District Court dismissed

MichGO's claims in their entirety. MichGO v. Norton, 477 F.Supp.2d 1 (2007). MichGO

then appealed to the District of Columbia Circuit Court, and the Court issued an opinion on

April 29, 2008 affirming the District Court. MichGO v. Kempthorne, No. 05CV01181

(D.C. Cir. Apr. 29, 2008), opinion attached hereto as "Exhibit B."

16.    Prior to the issuance of that opinion, however, MichGO moved to supplement the issues

presented to the Court of Appeals with *the very same* issue that the Plaintiff raises in this

case, specifically, whether the Tribe is an "Indian Tribe" under Section 19 of the Indian

Reorganization Act of 1934, 25 U.S.C. § 479. MichGO Mot. to Supplement, MichGO v.

Kempthorne, No. 05CV01181 (D.C.Cir. filed Mar. 7, 2008), attached hereto as "Exhibit C."

On March 19, 2008, the Court of Appeals denied MichGO's motion. MichGO v.

Kempthorne, No. 05CV01181 (D.C.Cir. Mar. 19, 2008), attached hereto as "Exhibit D."

MichGO then sought rehearing en banc of both the Court of Appeals' opinion and its order

denying MichGO's motion to supplement the issues. The Court of appeals denied

MichGO's Petition on July 25, 2008. MichGO v. Kempthorne, No. 05CV01181 (D.C.Cir.

July 25, 2008), attached hereto as "Exhibit E." MichGO has now sought to stay the Court of Appeals' opinion while it seeks review before the U.S. Supreme Court.

### Plaintiff's Relationship To The MichGO Litigation

17. Since at least 2001, when he signed a petition opposing the expansion of casino gaming, Plaintiff David Patchak has publicly opposed gaming in Michigan. See petition to oppose gaming, attached hereto as "Exhibit F."

18. In fact, it is well-known within the Wayland/Shelbyville area that Plaintiff is a member of MichGO or is affiliated with MichGO.

19. Plaintiff is also a member of "23 is Enough," which is a self-described "Political Action Committee" and is comprised of "a group of businesses and community leaders in Michigan who are opposed to expansion of casinos in Michigan," including the Gun Lake Tribe's casino. See http://www.23-is-enough.com/index.html, last visited on August 4, 2008, and supporters list attached hereto as "Exhibit G." 23 is Enough works in conjunction with MichGO, see MichGO Sues to Stop Gun Lake Casino, MIRS News, June 13, 2005, attached hereto as "Exhibit H."

20. 23 is Enough has actively opposed the Gun Lake Tribe's casino project, and has been well-aware of MichGO's lawsuit. In fact, it is reported that MichGO received its financial backing for the lawsuit against the Tribe from 23 is Enough, see Grand Rapids Press, Gun Lake Tribe Another Step Closer to Casino, Mlive.com, Feb. 24, 2007, attached hereto as "Exhibit I." Moreover, 23 is Enough and MichGO have shared the same spokesman, John Helmholdt, see Paul R. Kopenkoskey, Tribe Declares Victory for Wayland Twp. Casino, Mlive.com, Feb. 25, 2007, attached hereto as "Exhibit J."

21.   Although MichGO does not publish an exhaustive list of its members, its Officers and

Boards are referenced on its letterhead, see Letter to MichGO Members from Boorsma

(Sept. 2005), attached hereto as "Exhibit K."   23 is Enough does publish a list of its

members, see 23 is Enough supporters list, found at http://www.23-is-

enough.com/supporters.htm, last visited on August 4, 2008, and attached hereto as "Exhibit

G." MichGO and 23 is Enough share many of the same members, including Todd Boorsma,

Jim Stringham (Vice President/Treasurer of MichGO), Sue Boorsma (Secretary of

MichGO), Fulton Sheen (MichGO Board of Reference), Gary Granger (MichGO Board of

Reference), Rusty Merchant (MichGO Board of Reference), and Rex Rogers (MichGO

Board of Reference).  It is well known that Plaintiff has been affiliated with or associated

with many of these individuals, including MichGO President Todd Boorsma, whom Plaintiff

has supported for State office, see Campaign Contribution Search Results, attached hereto as

"Exhibit L."

22.   Plaintiff has also been aware of the MichGO litigation in connection with his service on the

Wayland Township Board since 2004, as well as his service on the Wayland Township

Planning Commission for ten years.   See Patchack advertisement, attached hereto as

"Exhibit M."  In fact, Wayland Township filed an Amicus Brief in Support of the Tribe in

the MichGO litigation, see Amicus Brief of Wayland Township, et al., MichGO v. Norton,

No. 05-cv-01181 (D.D.C. Jan. 19, 2006), attached hereto as "Exhibit N."  Plaintiff was

present at October 19, 2005 Wayland Township Board meeting, wherein the Board voted to

file its Amicus Brief.  See Oct. 19, 2005 Meeting Minutes attached hereto as "Exhibit O."

The Tribe's proposed casino was also discussed at several other Wayland Township Board

meetings, as evidenced by the November 5, 2007 and June 2, 2008 Minutes, which are collectively attached hereto as "Exhibit P."

<div align="center">

**The Tribe's Need For Trust Land And Its Interests In This Case**

</div>

23.    The Tribe has expended considerable time and effort in its endeavor to place the Bradley Tract into trust, and this endeavor is the Tribe's highest priority.  This acquisition is critical to the Tribe's plans for economic development and self-sufficiency.

24.    The Tribe seeks to place the Bradley Tract into trust to enable the Tribe to be eligible for benefits and services that are only available to federally-recognized tribes with trust or restricted lands, including those specified in the Tribe's Fee-to-Trust Application.

25.    The Tribe also seeks to place the Bradley Tract into trust to enable the Tribe to invoke its congressionally-conferred right to operate gaming on the parcel in accordance with the Indian Gaming Regulatory Act.  The Tribe determined that a gaming and entertainment facility, developed on trust land, would provide an economic base to enable the Tribe to provide governmental services related to housing and health care as well as provide jobs both for Tribe Members and for other residents of the community.

26.    The Tribe seeks to operate a gaming facility on the Bradley Tract in order to improve the economic well-being of the Tribe and its Members, and to provide for greater self-determination and self-sufficiency.  The gaming facility that the Tribe intends to operate will significantly contribute to the Tribe's ability to promote the health, welfare and economic self-sufficiency of its Members.

27.    Without trust land, the Tribe lacks an economic base to provide essential governmental services, employment and housing for its Members.

28.   Like any government, the Tribe seeks to provide essential services and improved quality of

life for its Members and future generations.  The gaming facility is the only realistic means

available to the Tribe to realize this goal.  Each day the Bradley Tract is not in trust

postpones the Tribe's plans to develop that Tract and perpetuates the Tribe's lack of an

economic base.

29.   The delay also perpetuates the cycle of poverty and unemployment for the Tribal Members.

As of April 2005, the Tribe's unemployment rate was approximately 27%, which is six

times higher than that of non-Tribal members in the surrounding area for this time period.

Only 26% of Tribal Members own their residences, which is well below the home

ownership rate of 83% for the surrounding areas.

30.   The gaming facility will assist the Tribe by providing it with the financial resources needed

to support Tribal critical social programs essential to fostering and preserving the health and

well-being of its Members, including rental housing assistance, emergency assistance, health

care, home buying assistance, youth programs, higher education programs, and elder care.

31.   In recent months, in anticipation that the title will be transferred to the Tribe when the

mandate is issued by the Court of Appeals in the MichGO case, the Tribe has expended

millions of dollars on conducting the selection process for the General Contractor for the

facility, retaining numerous professional consultants (including architects, engineers and

construction consultants), assembling orders for construction materials, and arranging

financing for the project.

32.   I received a copy of a letter written by Gina L. Allery, attorney for the Defendants in this

case, to Bruce Courtade, Plaintiff's attorney, informing Mr. Courtade that the United States

"agrees not to take the land [the Bradley Tract] into trust for purposes of the above-

captioned case [MichGO] until the mandate issues in <u>MichGO v. Kempthorne</u> and will provide Plaintiff within 15 calendar days following the issuance of the mandate in which to file their motion for preliminary injunction to prevent the United States from taking the land into trust." <u>See</u> Letter from Allery to Courtade (July 31, 2008), attached hereto as "Exhibit Q." The United States did not consult the Tribe prior to issuing this letter to Mr. Courtade, nor did the Tribe or its attorneys acquiesce to the United States' agreement to provide the Plaintiff with 15 calendar days following the issuance of the mandate to file his motion for preliminary injunction.

I swear under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

_08-19-2008_
Dated

_____
Chairman David K. Sprague



Front of Ampro building looking north.



East of Ampro building looking northwest.



Barn on Project Site looking west.



Ampro building looking east from 129th Ave.

EXHIBIT

A

*Gun Lake / 201503* ∎

**Figure 3-2**
Site Photographs

Property Boundary

N

EXISTING AMPRO BUILDING

Highway 131

Gun Lake / 201503

**Figure 3-3**
Aerial Photo of Casino Site







Wayland Township
Official
FUTURE LAND USE MAP
Revised 11/26/2002

ALLEGAN COUNTY, MICHIGAN

1 MILE

Future Land Use Legend

ACREAGE % AREA

| LABEL | LAND USE DISTRICT | | |
|---|---|---|---|
| A | Agriculture | 6,165.0 | 29.4 |
| C | Commercial | 207.2 | 1 |
| I | Industrial | 903.6 | 4.6 |
| LDR | Low Density Residential | 2,292.1 | |
| MDR | Medium Density Residential | 1,161.4 | 5.6 |
| MF | Multi-family | 42.5 | .2 |
| MHP | Mobile Home Park | 82.2 | 4 |
| MIX | Mixed Use | 337.9 | |
| RP | Rural Preservation | 8,745.3 | 41.7 |
| RR | Recreational Resort | 328.4 | |
| V | Village | 321.7 | |
| | | 20,864.8 | |

Generalized Land Use Legend
for Adjacent Jurisdictions

Agricultural
Commercial
Government
Industrial
Open Space
Residential
Right of Way
Rural
Water

Future Land Use Overlays

Rabbit River Protection Zone (100' both sides)

Future Public Road

Allegan County Land Information Services

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 19, 2007　　　　　Decided April 29, 2008

No. 07-5092

MICHIGAN GAMBLING OPPOSITION,
A MICHIGAN NON-PROFIT CORPORATION,
APPELLANT

v.

DIRK KEMPTHORNE, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES
DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 05cv01181)

———

*John J. Bursch* argued the cause for appellant. With him on the briefs were *Rebecca A. Womeldorf, Daniel P. Ettinger,* and *Joseph A. Kuiper.*

*Aaron P. Avila,* Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief was *Elizabeth A. Peterson,* Attorney. *R. Craig Lawrence,* Assistant U.S. Attorney, entered an appearance.

EXHIBIT

B

ALL-STATE LEGAL®

2

*Nicholas C. Yost*, *Seth P. Waxman*, *Edward C. DuMont*, *Demian S. Ahn*, and *Conly J. Schulte* were on the brief for appellee Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians.

Before: GINSBURG, ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Opinion dissenting in part by *Circuit Judge* BROWN.

PER CURIAM: In 2005, the Assistant Secretary for Indian Affairs of the Bureau of Indian Affairs of the Department of Interior decided to take 147 acres of land in Wayland Township, Michigan, into trust for use by the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians ("the Tribe"), which plans to construct and operate a Class III casino. This decision followed federal recognition of the Tribe in 1998. A non-profit Michigan membership organization — Michigan Gambling Opposition ("MichGO") — sued the Secretary of the Interior, the Bureau of Indian Affairs ("BIA") and the National Indian Gaming Commission ("NIGC") (collectively the "DOI") alleging that the DOI's approval of the proposed casino violated the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 4321 et seq., and that section 5 of the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465, was unconstitutional. The district court granted summary judgment to the DOI, and MichGO appeals. We hold that the DOI did not violate NEPA and that section 5 of the IRA is not an unconstitutional delegation of legislative authority. Accordingly, we affirm.

## I.

The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians has lived in Michigan continuously since it emerged as

3

a recognizable unit under Chief Match-E-Be-Nash-She-Wish at the turn of the nineteenth century. At that time, the Tribe lived near Kalamazoo, Michigan, along the Kalamazoo River. The Tribe was party to several treaties with the United States, and it was adversely affected by several others, with the result that it lost all of its lands near Kalamazoo by the middle of the nineteenth century. It avoided being moved to reservations further west by taking asylum with a church mission in central Michigan, near the town of Bradley. Around the end of the nineteenth century, land in the church mission was distributed to individual members of the Tribe. This distribution was in accord, although not directly part of, broader federal policies of the time, which emphasized breaking up tribal holdings and distributing parcels of land to individuals. *See* Judith V. Royster, *The Legacy of Allotment*, 27 ARIZ. ST. L.J. 1, 10-12 (1995). Most of the land distributed to individual members of the Tribe was lost because of failure to pay property taxes, as was the case for large portions of the land distributed under broader federal policies, *id.* at 12, but members of the Tribe continued to reside around the former church mission.

The Tribe, now numbering 277 members, secured federal acknowledgment of its existence in 1998, under the BIA's formal recognition procedure. The Tribe and BIA plan for BIA to acquire land as a reservation for the Tribe, using the Secretary of the Interior's authority under section 5 of the IRA to take land into trust for Indians, 25 U.S.C. § 465. They have identified a 147-acre tract of land ("the Bradley property") that they find suitable for this purpose. The Bradley property is located in Wayland township (population 3,013), a largely rural area about twenty-five miles north of Kalamazoo and thirty miles south of Grand Rapids. Seeking to advance the economic well-being of its members, who suffer from unemployment rates approximately six times the average of their surrounding area, and to promote economic self-sufficiency, the Tribe plans to use

4

the Bradley property to host a Class III gambling casino. The planned facility would comprise approximately 99,000 square feet of gambling, with additional floor space devoted to restaurants, stores, and offices. The Tribe expects 8,500 visitors per day.

As BIA studied the Tribe's proposal, it prepared an environmental assessment ("EA") under the auspices of NEPA, 42 U.S.C. § 4321 et seq. The EA analyzed the effects the proposed casino would have on area wildlife, air and water; farming in the vicinity; and nearby communities. One of the issues addressed by the EA was the possibility that the casino would increase local traffic. The EA used the U.S. Department of Transportation ("DOT") grading system to assess the severity of potential traffic delays: "Level Of Service A" means free passage, while "Level of Service F" means a driver can expect to wait eighty seconds or more before passing through an unsignaled intersection. The EA defined acceptable traffic delays to be "Level of Service C" or better. However, because Michigan does not grade intersections, the BIA concluded that approval by the Michigan Department of Transportation ("MDOT") would also qualify an intersection's traffic levels as acceptable.

Applying the DOT classification system, a study commissioned as part of the EA identified two local intersections where increased casino-related traffic would result in Level of Service F at certain times. These intersections sit at the junction of US-131, a limited access highway that runs north and south along the west edge of the Bradley property, and Michigan-179 (129th Avenue), a two-lane road that runs east and west along the south edge of the Bradley property. The study predicted that the casino would cause heavy traffic at the right turn from the northbound exit onto 129th Avenue (eastbound) and at the left turn from the southbound exit onto

5

129th Avenue (eastbound).    Resulting delays would be particularly severe during afternoon rush hours.

To mitigate the traffic impact of the casino, the EA recommended construction of a new, dedicated right-turn lane for the northbound intersection and adding a four-way stop to the southbound intersection.  It acknowledged the southbound left turn would still operate during peak periods at Level of Service F, so that a traffic light might be necessary.  Although MDOT apparently will not commit to a traffic light based on predictions of traffic volume, it apparently would approve a dedicated right turn lane and a four-way stop.[1]

Having concluded that proposed measures would sufficiently alleviate traffic delays and that other potential problems identified in the EA would also be mitigated, the BIA and the NIGC both issued Findings of No Significant Impact ("FONSI") with respect to the casino project and announced their intent to acquire the Bradley property and allow the casino.

MichGO filed this lawsuit in June 2005, advancing four claims.  The first alleged that the preparation of a FONSI rather than an environmental impact statement ("EIS") violated NEPA. The second and third alleged violations of the Indian Gaming Regulatory Act ("IGRA").  The fourth alleged that the IRA is an

---

[1] The EA relied on a September 25, 2001, letter from MDOT, which approved the dedicated right-turn lane; this letter did not expressly mention the four-way stop or any of the traffic study's conclusions. Letter from Robert Coy, Region Permit Agent, MDOT, to Marc Start, URS Corporation (Sept. 25, 2001).  However, a letter from MDOT to the Tribe on February 12, 2002, cited the completed traffic study and approved its recommendations, which included the four-way stop. Letter from Robert Coy, Region Permit Agent, MDOT, to D.K. Sprague, Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, Gun Lake Tribe (Feb. 12, 2002).

6

unconstitutional delegation of authority to the Secretary of the Interior because there is no intelligible principle limiting its discretion on what land to acquire and hold in trust. The Tribe was allowed to intervene as a defendant. The district court granted summary judgment to the DOI on February 23, 2007. *Mich. Gambling Opposition (MichGO) v. Norton*, 477 F. Supp. 2d 1, 22 (D.D.C. 2007). MichGO appeals and our review is de novo. *Sample v. Bureau of Prisons*, 466 F.3d 1086, 1087 (D.C. Cir. 2006). However, in view of *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460 (D.C. Cir. 2007), MichGO does not pursue its IGRA claims. Appellant's Reply Br. 2 n.1.

## II.

NEPA requires every agency proposing a "major Federal action" to prepare a statement of its environmental impact if the action will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(C). Under regulations promulgated by the Council on Environmental Quality ("CEQ") agencies must create procedures identifying "[s]pecific criteria for and identification of those typical classes of action" that require or do not require an EIS. 40 C.F.R. § 1507.3(b)(2). In considering any particular proposed action, an agency must first determine whether, under its own regulations, the proposal would "[n]ormally require[] an [EIS]" or "[n]ormally [would] not require either an [EIS] or an [EA]." *Id.* § 1501.4(a). If the proposed action is not covered by either of these descriptions, the agency should prepare an EA, and based on its conclusions, decide whether to prepare an EIS. *Id.* §§ 1501.4(b)-(c). The agency may conclude that an EIS is not necessary and instead issue a FONSI, in which it must explain why there will be no significant impact. *Id.* §§ 1501.4(e); 1508.13.

7

## A.

MichGO contends that the Tribe's casino is large and controversial, and that the DOI is thus required by law to prepare an EIS. To support this contention, MichGO relies on the 2005 "Checklist for Gaming Acquisitions," distributed to regional directors by the BIA, which provides that "[p]roposals for large, and/or potentially controversial gaming establishments should require the preparation of an EIS."[2] MichGO maintains that 40 C.F.R. § 1501.4(a) requires an EIS to be performed if mandated by internal DOI guidelines such as the Checklist.

The premise underlying MichGO's contention is flawed. Section 1501.4(a) does not make the Checklist binding on the DOI. The CEQ does require each agency to "[d]etermine under its procedures" whether a project is of a type that normally requires an EIS. *Id.* § 1501.4(a). But it also specifies that these procedures will be established pursuant to section 1507.3. *Id.* Section 1507.3 sets out a specific process for developing the relevant agency procedures; as part of this process, the CEQ must approve the procedures before they are implemented. *Id.* § 1507.3(a). The DOI complied with these requirements when it established its NEPA procedures, now codified in its manual. DEP'T OF THE INTERIOR, DEPARTMENT MANUAL, Pt. 516, Chpt. 10 (May 27, 2004). These procedures do not encompass the Checklist, which in any event does not appear to have been approved by the CEQ as required by section 1507.3(a). The manual does, however, include lists of activities that under its procedures normally require or do not require an EIS or EA. *Id.* Gaming activities are not included in these lists. In these circumstances, the section 1501.4(b)-(c) process — EA preparation followed by a decision on whether to prepare an EIS

---

[2] OFFICE OF INDIAN GAMING MGMT., DEP'T OF THE INTERIOR, CHECKLIST FOR GAMING ACQUISITIONS GAMING-RELATED ACQUISITIONS AND IGRA SECTION 20 DETERMINATIONS 10 (2005) ("Checklist").

8

— is applicable. The DOI followed these procedures and lawfully determined not to prepare an EIS on the basis of the EA.[3]

Because we are unpersuaded that the Checklist is binding on the DOI, we do not reach MichGO's contention that the casino project at issue is "large" and "controversial" within the meaning of the Checklist.

### B.

Alternatively, MichGO contends that it was arbitrary or capricious for the DOI to issue a FONSI without having prepared an EIS because two intersections would continue to experience Level of Service F at certain times, even after mitigation measures.[4]

A court reviews an agency's FONSI or EIS under the Administrative Procedure Act, 5 U.S.C. § 706, and "cannot substitute [its] judgment for that of an agency if the agency's decision was 'fully informed and well considered.'" *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 684 (D.C. Cir. 1982) (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435

---

[3]    MichGO's suggestion in its brief that the Checklist is binding independent of 40 C.F.R. § 1501.4 is not appropriately developed and thus not properly before the court. *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005). MichGO also maintains that ignoring non-binding regulations is arbitrary and capricious, but this contention is waived as it is raised only in the reply brief. *Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n.4 (D.C. Cir. 1990).

[4]  MichGO maintains in a footnote of its initial brief and in its Reply Brief that increased traffic in the Village of Hopkins will constitute a significant, unmitigated impact. We do not consider this argument. "[A]bsent extraordinary circumstances . . . we do not entertain an argument raised for the first time in a reply brief . . . or . . . a footnote." *United States v. Whren*, 111 F.3d 956, 958 (D.C. Cir. 1997).

9

U.S. 519, 558 (1978)). If the agency decided to issue a FONSI, it must either have concluded there would be no significant impact or have planned measures to mitigate such impacts. A court must review whether the agency:

> (1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its EA, (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.

*TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006) (internal quotations omitted).

The EA found that at least one intersection would experience Level of Service F at certain times even after mitigation measures. However, contrary to the assumption underlying MichGO's contentions, the EA's definition of acceptable traffic performance was not based solely on the level-of-service classification. Rather, the EA noted that local authorities had no standards for traffic intensity; thus the EA deployed two separate indicators as proof of acceptable traffic conditions: either Level of Service C or above *or* approval by relevant local authorities. MDOT, the agency with jurisdiction over these roads, found the traffic levels projected after the DOI's mitigation measures would be acceptable. It was not inherently arbitrary or capricious for the DOI to rely on MDOT's assessment, *cf. Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 237 (5th Cir. 2006), and MichGO gives us no reason to question that reliance. The DOI was thus justified in finding that mitigation of the traffic impact was sufficient, and that an EIS was unnecessary.

10

## III.

Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art I, § 1. In considering a challenge to a delegation of power, "the test is whether Congress has set forth 'an intelligible principle to which the person or body authorized to act is directed to conform.'" *TOMAC*, 433 F.3d at 866 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (alterations and internal quotations omitted)). The Supreme Court has underscored that "the general policy and boundaries of a delegation 'need not be tested in isolation' . . . [as] the statutory language may derive content from the 'purpose of the Act, its factual background and the statutory context.'" *Id.* (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 104 (1946)). Courts "have almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman*, 531 U.S. at 474-75 (internal quotations omitted).

MichGO contends that section 5 of the IRA is an unconstitutional delegation of legislative power because, apart from the DOI's internal regulations, which cannot fill the void, it is "completely devoid of intelligible standards to guide or limit the Secretary's discretion." Appellant's Br. at 35. We are not convinced. An agency cannot "cure an unconstitutionally standardless delegation of power by declining to exercise some of that power," *Whitman*, 531 U.S. at 473, as the district court incorrectly suggested, *MichGO*, 477 F. Supp. 2d at 21-22. But giving due consideration to the purpose and factual background of the IRA and section 5's statutory context, as the Supreme Court instructs, *see Am. Power & Light Co.*, 329 U.S. at 104, and having due regard that "Congress is not confined to that method of executing its policy which involves the least possible

11

delegation of discretion," *Yakus v. United States*, 321 U.S. 414, 425-26 (1944), we conclude the statute provides an intelligible principle.[5]

Section 5 of the IRA authorizes the Secretary of the Interior to obtain land "for Indians."[6]  25 U.S.C. § 465.  This court has

---

[5] Hence the court has no occasion to address the Tribe's contention that the non-delegation doctrine is inapplicable because section 5 of the IRA does not involve a delegation of legislative power.

[6] Section 5 of the IRA provides in relevant part:

> The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.

> For the acquisition of such lands, interests in lands, water rights, and surface rights, and for expenses incident to such acquisition, there is authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, a sum not to exceed $2,000,000 in any one fiscal year . . . .

> . . .

> Title to any lands or rights acquired pursuant to this Act . . . shall be taken in the name of the United States in trust for the Indian tribe . . . for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

25 U.S.C. § 465.

12

not previously considered whether section 5 constitutes an unconstitutionally standardless delegation of power. But on its face, the delegation is no broader than other statutes, which the Supreme Court has upheld, that direct agencies to act in the "public interest," *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943), or in a way that is "fair and equitable," *Yakus,* 321 U.S. at 420, *see also Whitman*, 531 U.S. at 473-75. Furthermore, the courts of appeals for the First, Eighth and Tenth Circuits have rejected challenges contending that section 5 is an unconstitutional delegation. *See Carcieri v. Norton*, 497 F.3d 15, 41-43 (1st Cir. 2007) (en banc), *cert. granted in part, denied on non-delegation issue*, 128 S. Ct. 1443 (2008); *South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 799 (8th Cir. 2005); *United States v. Roberts*, 185 F.3d 1125, 1137 (10th Cir. 1999). These courts have held "that an intelligible principle exists in the statutory phrase 'for the purpose of providing land for Indians' when it is viewed in the statutory and historical context of the IRA." This principle involves "providing lands sufficient to enable Indians to achieve self-support and ameliorating the damage resulting from . . . prior [federal policy]." *South Dakota*, 423 F.3d at 799 (quoting 25 U.S.C. § 465); *accord Carcieri*, 497 F.3d at 42; *Roberts*, 185 F.3d at 1137.

Our review of the purpose and structure of the IRA confirms that, as our sister courts have held, and contrary to the view of our dissenting colleague, the statute provides an intelligible principle rather than a tautology when it authorizes the Secretary to acquire land "for the purpose of providing land for Indians": the Secretary is to exercise his powers in order to further economic development and self-governance among the Tribes. *Cf.* Dissenting Op. at 7-8. The Supreme Court has noted that "[t]he intent and purpose of the [IRA] was to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression."

13

*Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152 (1973) (internal quotations omitted). This accords with the IRA's stated purpose of "conserv[ing] and develop[ing] Indian lands and resources; . . . extend[ing] to Indians the right to form business and other organizations; . . . establish[ing] a credit system for Indians; . . . grant[ing] certain rights of home rule to Indians; . . . and [effectuating] other purposes." Pub. L. No. 383, 48 Stat. 984, 984 (1934).

In addition to section 5, the IRA includes numerous other provisions addressing land use and economic development; among other things, these extend tribal trusts indefinitely, 25 U.S.C. § 462; restore lands previously declared "surplus" to those trusts, *id.* § 463; restrict land transfers from tribal reservations, *id.* § 464; and provide federal appropriations to support Indian economic development, *id.* § 470. This context underscores section 5's role as part of a broad effort to promote economic development among American Indians, with a special emphasis on preventing and recouping losses of land caused by previous federal policies. The Supreme Court has acknowledged this emphasis, explaining that the IRA's passage brought "an abrupt end" to the previous federal "policy of allotment" that had led to individuals who were not American Indians acquiring "over two-thirds of the Indian lands allotted." *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 255 (1992). The Court also emphasized that through the IRA Congress "[r]eturn[ed] to the principles of tribal self-determination and self-governance which had characterized" earlier federal policy. *Id.*

The standards revealed by examining the purpose and structure of the IRA are confirmed by reviewing the broader factual context of the statute. The IRA was enacted against a backdrop of great concern over economic and social challenges facing American Indians, and especially over the consequences

14

of the federal government's allotment policy, which had resulted in many tribal lands being distributed to individuals who then lost control of them, often because of fraud or inability to pay taxes. Royster, 27 ARIZ. ST. L.J. at 12. By 1928, a report commissioned by the Secretary of the Interior found that the allotment policy had "destructive effects . . . on the economic, social, cultural and physical well-being of the tribes." *Id.* at 16. As both the Supreme Court, *Mescalero Apache Tribe*, 411 U.S. at 152, and circuit courts, *South Dakota*, 423 F.3d at 798; *Carcieri*, 497 F.3d at 42, have acknowledged, the legislative history of the IRA also underscores its purpose of addressing economic and social challenges facing American Indians by promoting economic development. *See* H.R. Rep. No. 73-1804, at 6 (1934); S. Rep. No. 73-1080, at 1-2 (1934).[7]

There is nothing to suggest that section 5 is removed from the overall IRA purpose of advancing economic development

---

[7]  The IRA's provisions constitute one chapter in a long and complicated history of interactions between the United States and American Indians.  Our dissenting colleague asserts a trust relationship arises between the Indians and the United States only after the Government acquires land for the Indians, Dissenting Op. at 6, but this confuses the fiduciary relationship that arises because the United States is to hold newly-acquired land "in trust" under section 5 of the IRA, *see Cobell v. Norton*, 240 F.3d 1081, 1088 (D.C. Cir. 2001); *see also United States v. Wilson*, 881 F.2d 596, 600 (9th Cir. 1989), with the pre-existing "special relationship" that arose by virtue of the Government's historical relations with the Indians, *see* 1 FELIX R. COHEN, COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 5.04[4][a] (2005) ("HANDBOOK").  That unique history informs our understanding of section 5 of the IRA; a statute authorizing the acquisition of land "for the purpose of providing land for Indians" is simply not the same as a statute authorizing the acquisition of land "for the purpose of providing land for persons taller than 6 feet." *See generally* Reid P. Chambers, *Judicial Enforcement of the Federal Trust Responsibility to Indians*, 27 STAN. L. REV. 1213 (1975).

15

among American Indians. While certain sections of the IRA include more specific language than section 5, *see, e.g.,* 25 U.S.C. § 463, this does not detract from the overall purposes of the statute. Although, as our dissenting colleague suggests, particular clauses of the IRA could be interpreted as not advancing the goal of economic development, not alleviating all the problems caused by the allotment policy, or advancing goals more narrow than general economic development, Dissenting Op. at 5-7, this analysis ignores the unambiguous purpose of the IRA as a whole.

Finally, we note that the Supreme Court has observed that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475. The scope of authority delegated to the Secretary under section 5 — to decide whether to grant status as "Indian Country" to specific plots of land owned by Indians or that is acquired for them — is not so broad as to require limiting principles more specific than pursuing Indian economic development. Our conclusion is underscored by examining historical and contemporary context. The Executive has historically enjoyed extensive authority in conducting relations with American Indians, which has included negotiating treaties with Indian tribes and granting reservations to them by executive order. *See, e.g.,* HANDBOOK, *supra,* §§ 1.03; 15.04[4]; *cf. Zemel v. Rusk,* 381 U.S. 1, 17-18 (1965). "[E]ven in sweeping regulatory schemes . . . statutes [are not required to] provide a determinate criterion" delimiting precisely how much of a good or harm an agency must address. *Whitman*, 531 U.S. at 475 (internal quotations omitted). Our dissenting colleague asserts that the Secretary's powers under section 5 are vast, Dissenting Op. at 10-12, pointing to the many significant consequences that flow from the Secretary's decision to accept land in trust for the Indians. But these consequences follow from section 5 and from other statutes, not from the decision of

16

the Secretary to acquire land in trust, for section 5 gives the Secretary no power to regulate state taxing authority or anything else. Our dissenting colleague further faults Congress for not providing a narrower standard, but Congress must provide only an "intelligible" standard, *Whitman*, 531 U.S. at 474-75. That standard need not be utterly unambiguous, for it is settled that Congress may delegate interstitial lawmaking authority to executive agencies. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).[8]

For these reasons, we join the First, Eighth and Tenth Circuits, *Carcieri*, 497 F.3d at 43; *South Dakota*, 423 F.3d at 799; *Roberts*, 185 F.3d at 1137, in upholding section 5 of the IRA. In cases entertaining (and rejecting) challenges asserting an unconstitutional delegation, the Supreme Court has "giv[en] narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional," *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989), and has done so by looking at clauses that neighbor the delegation of power, *e.g.*, *Am. Power & Light Co.*, 329 U.S. at 104-05, as well as the statute's overriding purpose, *e.g.*, *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24-25 (1932). Congress may legislate its goals explicitly, *see, e.g.*, *Mistretta*, 488 U.S. at 374, but it need not do so. We thus hold, relying upon the text, structure, and purpose of the IRA, as well as the context of its enactment, that section 5 contains an intelligible principle and

---

[8] Nor are we concerned, for purposes of the non-delegation doctrine, that the Secretary's decision to take land in trust might be unreviewable in a court of law. Dissenting Op. at 7-8 (citing *State of Fla., Dep't of Bus. Regulation v. U.S. Dep't of Interior*, 768 F.2d 1248 (11th Cir. 1985)). Section 5 of the IRA intelligibly guides the Secretary's exercise of discretion, and that is all that the non-delegation doctrine requires. *Yakus*, 321 U.S. at 425-26; 5 U.S.C. § 701.

17

that it is not an unconstitutional delegation of legislative authority.

Accordingly, we affirm the grant of summary judgment.

BROWN, *Circuit Judge*, dissenting in part: I join Parts I and II of the court's opinion, but I cannot agree § 5 of the IRA is constitutional. Consequently, I dissent from Part III.

I

Like other courts that have rejected nondelegation challenges to § 5, *Carcieri v. Kempthorne*, 497 F.3d 15, 41–43 (1st Cir. 2007) (en banc); *South Dakota v. U.S. Dep't of the Interior*, 423 F.3d 790, 799 (8th Cir. 2005); *United States v. Roberts*, 185 F.3d 1125, 1137 (10th Cir. 1999), the majority nominally performs a nondelegation analysis but actually strips the doctrine of any meaning. It conjures standards and limits from thin air to construct a supposed intelligible principle for the § 5 delegation. Although I agree the nondelegation principle is extremely accommodating, the majority's willingness to imagine bounds on delegated authority goes so far as to render the principle nugatory. Analyzing the statute using ordinary tools of statutory construction, as the Supreme Court has always done in nondelegation cases, I am forced to conclude § 5 is unconstitutional.

The nondelegation doctrine prohibits Congress from making unbridled delegations of authority. The rule is not only a fundamental aspect of the separation of powers; it is an essential feature of democratic government. "[T]he delegation doctrine[] has developed to prevent Congress from forsaking its duties." *Loving v. United States*, 517 U.S. 748, 758 (1996). "[T]he constitutional question is whether the statute has delegated legislative power to the agency . . . [The Constitution's] text permits no delegation of those powers." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001); *see also Mistretta v. United States*, 488 U.S. 361, 371 (1989) ("The nondelegation doctrine is rooted in the principle of separation of powers . . . ."); *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928) ("[I]t is a breach of

2

the National fundamental law if Congress gives up its legislative power . . . ."). The nondelegation principle is integral to any notion of democratic accountability.

Thus, when Congress directs an agency to exercise its judgment, it must guide that judgment in some way. I agree with the majority that the nondelegation principle is not an onerous requirement. Nevertheless, Congress must at least "clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Mistretta*, 488 U.S. at 372–73; *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). The central question is whether there are "limits on [an agency's] discretion." *Whitman*, 531 U.S. at 473.

Like the majority, I take *Whitman* to have identified two ways in which Congress may provide the necessary bounds on a delegation: standards to guide an agency's judgment or, in their absence, stringent limits on the scope of the delegated authority. Standards to guide an agency are the ordinary way to limit its discretion. In the leading case, *A.L.A. Schechter Poultry Corp. v. United States*, the Supreme Court invalidated § 3 of the National Industrial Recovery Act, which allowed trade associations to develop codes of fair competition the President could adopt as law, with conditions as he thought "necessary." 295 U.S. 495, 522–23, 542 (1935). This statute was flawed because it "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474. Alternatively, "Congress need not provide any direction" if the "scope of the power congressionally conferred" is sufficiently small. *Id.* at 475. Either type of limit suffices on its own, but at least one must be present.

3

Thus, the "intelligible principle" required of a constitutional delegation is fairly minimal: a statute will fail only if it gives an agency too broad an authority with no standards to guide the agency's decisions. Section 5 is a rare example of a standardless delegation, allowing the Secretary of the Interior to take land in trust for whichever Indians he chooses, for whatever reasons. This power is far too broad in scope for Congress to have delegated without any standards.

II

A

First, § 5 lacks standards to guide the Secretary in the exercise of his authority. Such standards would not have to provide a "determinate criterion" to govern agency decisions, as long as they provide "substantial guidance." *Whitman*, 531 U.S. at 475. Standards need only provide some criteria, some guidelines, or some direction, so that when an agency exercises its judgment, the agency and the courts have some "intelligible principle" by which to gauge whether the agency's decision will further the purpose of the delegation. For example, to guide the Sentencing Commission, "Congress directed it to consider seven factors," listed in the statute. *Mistretta*, 488 U.S. at 375. In *Whitman*, the Clean Air Act required the EPA "to set air quality standards at the level that is 'requisite' . . . to protect the public health with an adequate margin of safety." 531 U.S. at 475–76.

"Whether [a] statute delegates legislative power is a question for the courts," *Whitman*, 531 U.S. at 473, and the purpose of an intelligible principle is to make sure it is not "impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." *Yakus v. United States*, 321 U.S. 414, 426 (1944). Congress must provide *legal*

4

standards because "[p]rivate rights are protected by access to the courts to test the application of the policy in the light of" the standards. *Am. Power & Light Co.*, 329 U.S. at 105. Thus, since Congress must lay down these standards by "legislative act," *Mistretta*, 488 U.S. at 372, we should seek standards for a delegation using the ordinary tools of statutory construction.

The kinds of tools the majority uses are occasionally appropriate aids for ascertaining the meaning of ambiguous statutory text. On the other hand, when a standard is not ambiguous, but simply absent, we may not supply one by ourselves. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992); *Gen. Elec. Co. v. EPA*, 360 F.3d 188, 191 (D.C. Cir. 2004). The majority not only supplies an absent standard, it actually invents the standard, imbuing § 5 with a spirit of "economic development" that somehow emanates from the context of the IRA.

In many nondelegation cases, Congress at least hints at a standard by directing an agency to exercise its authority "in the public interest"—words indicating some congressionally imposed limit, even if the vagueness of the phrase makes a court work to interpret it. Here, by contrast, the Secretary "is authorized" to acquire land for Indians "in his discretion." Rather than an ambiguous standard that requires interpretation, § 5 provides an obvious, unambiguous direction that the Secretary is to have complete discretion.

The majority proceeds, in the teeth of this clear text, to find, in the emanation from a variety of sources, the supposed true intelligible principle behind § 5: promoting Indian economic development so Indians can achieve "self-support," and recouping losses of land. But this standard arises from the majority's imagination, not from the sources.

5

First, the court cites the preamble to the IRA: "to conserve and develop Indian land and resources." Maj. Op. at 13. A policy of developing land is no more informative than a purpose of providing land, as a standard to help the Secretary decide whether to acquire a particular parcel. Nor do the preamble's policies of "extending the right to form business[es] . . . establishing a credit system," and the rest, give any better direction.

Second, the majority examines the structure of the IRA. Maj. Op. 13. Among its many provisions, the IRA makes trust status permanent, §§ 2 and 4, and provides for the recovery of Indian lands that had been opened for sale, § 3. Ironically, the restoration of lands under § 3 is not automatic, but rests in the Secretary's hands. Unlike § 5 acquisitions, the Secretary is to restore surplus lands "if he shall find it to be in the public interest." Ordinarily, a comparison of § 3 and § 5 would lead us, first, to conclude § 5 gives the Secretary authority to acquire new land, and, second, to construe § 5 to grant Secretary broader discretion when he acquires new land than when he restores surplus land. Instead the majority reads into § 5 an "emphasis" on recouping losses of land, an emphasis the text does not support. The majority also sees an emphasis on preventing losses of existing land, even though § 8, which declares that the IRA shall not cover "Indian holdings of allotments or homesteads upon the public domain outside" of reservations, actually limits the effect of the IRA on existing Indian land. Nor is it plausible to find a principle of "self-support" in a statute that actually installs a paternalistic scheme of government support. *See* § 4 (barring Indians from selling or transferring their trust land); § 12 (directing the Secretary to establish preferences for hiring Indians at the Indian Office); § 11 (appropriating money to send Indians to "vocational and trade schools" of which only

6

a limited amount may be spent for education in "high schools and colleges"); § 6 (establishing the Secretary's authority over how Indians should manage their forests and how many cows they may graze on their pastures).

The majority also cites the special trust relationship the United States bears towards Indians, waving the idea of this relationship as a talisman to bless the statute rather than actually using it to interpret the text. Nor could this trust relationship be useful to interpret § 5, because in fact the government has no free-standing duty, outside of specific statutes, treaties, or executive orders, to ensure its actions do not harm Indian interests. *N. Slope Borough v. Andrus*, 642 F.2d 589, 611 (D.C. Cir. 1980) (Secretary's trust obligations, if any, were coterminous with the ESA's requirements); *see also United States v. Wilson*, 881 F.2d 596, 600 (9th Cir. 1989) ("Absent . . . a fiduciary duty based on an authorizing document such as a statute or a regulation . . . there can be no trust relationship between [a tribe] and the BIA."). The only trust responsibility created by § 5 exists *after* the government acquires a parcel of land and therefore cannot guide the Secretary's decision *whether* to acquire the parcel. The majority adverts to the "unique history" of Indians in the United States, but this history gives rise only to "a moral obligation, without justiciable standards for its enforcement." Reid P. Chambers, *Judicial Enforcement of the Federal Trust Responsibility to Indians*, 27 STAN. L. REV. 1213, 1227 (1975). At best, courts distinguish statutes relating to Indians by applying the Indian canon of construction, *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 269 (1992), but "[t]he canon of construction regarding the resolution of ambiguities in favor of Indians, however, does not permit reliance on ambiguities that do not exist." *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986).

7

To summarize, the statutory language lacks any discernible boundaries. To rely on the purpose of "providing land for Indians" does nothing to cabin the Secretary's discretion over providing land for Indians because it is tautological. To say the purpose is to provide land for Indians in a broad effort to promote economic development (with a special emphasis on preventing land loss) is tautology on steroids. Making a different selection from the same smorgasbord, I might posit quite different principles—to provide land for landless Indians; to acquire trust lands to be used for farming; to supplement grazing and forestry lands; to provide lands in close proximity to existing reservations; to consolidate checkerboarded reservations. All of these goals would be reasonable, but none can be derived from the text of the IRA. The very fact that so many standards can be proposed merely highlights the fact that the statute itself fails to describe how the power conveyed is to be exercised. Thus, the Secretary's assertion of unguided power is not subject to any judicial check; nor, conversely, can he be required to act whenever he voluntarily refrains from using his discretionary power.

Even if this mood of economic self-sufficiency can be said to permeate § 5, it has never constituted a standard to guide the Secretary's decisions. Courts, like the BIA, have consistently interpreted the statute to mean what it says: the Secretary has unfettered discretion over which land to take in trust. *See, e.g., State of Fla., Dep't of Bus. Regulation v. U.S. Dep't of the Interior*, 768 F.2d 1248 (11th Cir. 1985) (Secretary may waive BIA regulations to acquire land for a tribal museum, and the court may not review his decision because it is committed to agency discretion). Again and again, courts have rejected challenges to acquisitions as beyond the Secretary's power, concluding that the

8

"deliberately broad and flexible grant of power" in § 5, *Stevens v. Comm'r of Internal Revenue*, 452 F.2d 741, 748 (9th Cir. 1971), encompasses any possible acquisition. *E.g.*, *Chase v. McMasters*, 573 F.2d 1011, 1015–16 (8th Cir. 1978) ("Congress did not limit the Secretary's discretion to select land for acquisition"; therefore, it was valid to accept land an Indian already owned and was giving to the United States in trust solely for the purpose of avoiding property taxes). The BIA has also regarded the Secretary's discretion as absolute, and its review board may only verify whether BIA considered the factors laid out in its own regulations. *Eades*, 17 I.B.I.A. 198, 200 (1989). Most recently, BIA has begun to deny trust applications for building casinos if it finds the casinos to lie beyond a "commutable" distance from tribes' existing reservations. *See* Memorandum from Carl Artman, Ass't Sec'y of the Interior, on Taking Off-Reservation Land into Trust for Gaming Purposes 1, 3 (Jan. 3, 2008) ("The decision whether to take land into trust . . . is discretionary with the Secretary.").[1]

In light of this history, it is a bit late for the court to claim there is in fact a standard, however loose, to which the Secretary must conform in his exercise of § 5 authority. Nor, given the weight of precedent, would I expect any court to apply the majority's "economic development with special emphasis" standard in reviewing an acquisition decision.

---

[1] BIA denies these applications because for far-away applications, the benefit to Indians does not outweigh the "concerns of state and local governments." *Id.* at 5 (citing 25 C.F.R. § 151.11(b)). If the majority is right about the principle guiding these decisions, it cannot be proper for BIA to deny an acquisition because of the harm to local government caused by "the removal of the land from the tax rolls," *id.*

9

My point here is not to quibble with the majority's conclusion that the purpose of § 5 is to enable self-support rather than dependency or to prevent losses rather than acquire new land. Rather, the court should not be playing this game at all. Indeed, the court's approach differs radically from the Supreme Court's analytical process in nondelegation challenges. For example, in the *Intermountain Rate Cases*, the Court, recognizing that "we must be governed by the statute and its plain meaning," interpreted a challenged section to incorporate a prohibition on "undue preference and discrimination" from the text of a neighboring section. 234 U.S. 476, 485–86, 488 (1914). In *American Power & Light Co.*, the Court relied on a statute's specific standards for new security issues that constituted "a veritable code of rules" to inform the SEC's discretion to ban "unduly or unnecessarily complicate[d]" corporate structures. 329 U.S. at 105. I could continue with examples, but they all illustrate the same point: even in a nondelegation challenge, a court must find meaning for an ambiguous phrase in some relevant text. Here, by contrast, the majority perceives a mood of economic development, which Congress did not articulate, and the majority justifies this mood by its own assessment of Congress's good intentions.

In short, this court, like the First, Eighth, and Tenth Circuits before it, has constructed an intelligible principle for § 5 that consists simply of knowing why Congress enacted the provision. I do not deny that Congress wanted to alleviate the problems faced by Native Americans. Nevertheless, this alleged intelligible principle is relevant only for nondelegation challenges. The fact that the Supreme Court has also acknowledged the motivation for the IRA, Maj. Op. at 13–14, does not make that motivation any more meaningful as a standard to guide the Secretary's decisions on trust

10

acquisitions.[2] If it were meaningful, it would be contrary to the plain text of § 5, which gives the Secretary unfettered discretion over such decisions.

## B

Given the absence of standards to govern the Secretary's exercise of his § 5 authority, I conclude the authority is too broad to be valid. Unquestionably, a standardless delegation is valid if it is small; "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Whitman*, 531 U.S. at 475. While the majority recognizes that scope matters, it fails to acknowledge that under established nondelegation doctrine, a standardless delegation must be quite narrow. *Whitman* provided the canonical example of a sufficiently small delegation: EPA can "define 'country elevators,' which are to be exempt from new-stationary-source regulations governing grain elevators." *Id.*; *see* 42 U.S.C. § 7411(i) ("Any regulations promulgated by the Administrator under this section applicable to grain elevators shall not apply to country elevators (as defined by the Administrator) which have a storage capacity of less than two million five hundred thousand bushels.").

By contrast, the § 5 power is quite broad. The majority blandly characterizes it as the power to grant status as Indian country, but the majority ignores the far-reaching consequences of that status.[3] By taking land in trust for

---

[2] Amusingly, *Mescalero Apache Tribe v. Jones*, in perhaps ill-considered dicta, recited the same legislative history as the majority on its way to *limiting* the tax immunities enjoyed by Indians. 411 U.S. 145, 152–59 (1973).

[3] The majority also regards the power to hold land in trust as having aspects of Executive authority, apparently akin to the foreign

11

Indians, the Secretary removes it from the jurisdiction of the State in which it sits and places it under the authority of a tribe. *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 529–31 (1998) (noting federal land held in trust for Indians is Indian country (citing *United States v. McGowan*, 302 U.S. 535 (1938)). Thus, the trust acquisition authority is a power to determine who writes the law, and thus indirectly what the law will be, for particular plots of land.

The consequences of the Indian country designation are profound. Most obviously, Indian country and its beneficial owners are "exempt from State and local taxation." 25 U.S.C. § 465 para. 4. Indeed, tribal residents of Indian country are even exempt from motor vehicle and state income taxes. *Okla. Tax Comm'n v. Sac & Fox Nation*, 508 U.S. 114, 127–28 (1993); *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 165 (1973). More generally, Indian country is subject to federal and tribal jurisdiction in both civil and criminal matters. *Native Vill. of Venetie*, 522 U.S. at 527 & n.1 (civil); *DeCoteau v. Dist. County Court for the Tenth Judicial Dist.*, 420 U.S. 425, 428 n.2 (1975) (civil); *see United States v. John*, 437 U.S. 634, 649, 654 (1978) (reversing state conviction for a crime committed on trust land). A state "presumptively lacks jurisdiction to enforce" its regulations in Indian country. *Narragansett Indian Tribe v. Narragansett Elec. Co.*, 89 F.3d 908, 915 (1st Cir. 1996). A tribal sovereign ousts a state, unless Congress expressly provides otherwise. *California v. Cabazon Band of Mission Indians*,

---

relations powers that mitigated a delegation in *Zemel v. Rusk*, 381 U.S. 1, 17–18 (1965). Maj. Op. at 14–15. Regardless of the Executive's role in concluding treaties with Indians, "the Constitution places the authority to dispose of public lands exclusively in Congress," and that includes the power to hold lands in trust. *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 326 (1942); *see also* U.S. CONST. art. IV, § 3 cl. 2 (Property Clause).

12

480 U.S. 202, 207 (1987).[4]  These consequences result not from other statutes, as the majority claims, Maj. Op. at 15–16, but from the "attributes of sovereignty" that "Indian tribes retain." *Id.* at 207; *see also Okla. Tax Comm'n,* 508 U.S. at 128,   Surely we need not avert our gaze from the constitutional backdrop against which Congress legislates.

Thus, § 5 allows the Secretary, by taking land in trust for Indians, to oust state jurisdiction in favor of government by the beneficiaries he chooses.  Although there are certain limits on the scope of this power, such as the restriction that land may only be held "for Indians," they are not nearly narrow enough to validate a standardless delegation.  By comparison to the EPA's authority to define country elevators, the § 5 power is astoundingly broad.  While the EPA was allowed to exempt certain pollution sources, circumscribed by size, from pollution regulations the EPA itself had imposed under a specific provision, 42 U.S.C. § 7411, here the Secretary can completely remove areas of land from the jurisdiction of state and local governments.  Although this power may not need the "substantial guidance" the Supreme Court thought necessary for the EPA's broad authority to set air-quality standards, *Whitman,* 531 U.S. at 476, the power it confers is far too broad to survive without any guidance at all.

C

---

[4] The Gun Lake Band casino project nicely illustrates how substantially a change to Indian country status can affect both Indians and non-Indians in the vicinity of trust land.  Local governments stand to lose $85,000 per year in direct property taxes, while the extra traffic and other activity connected to the casino will force local police to hire additional staff at a cost of over $400,000 per year.

13

Section 5 gives the Secretary unguided authority to transfer areas of land from the jurisdiction of state and local government to that of various bands of Indians. None of the foregoing implies BIA has exercised its authority wantonly. But the question is not what it has done, but what it has authority to do. The authority was Congress's to give, and the boundaries were for Congress to provide as well. Since it has failed to do so, I am forced to conclude § 5 of the IRA is an unconstitutional delegation.

DOCKET NO. 07-5092

RECEIVED
U.S. COURT OF APPEALS
FOR THE D.C. CIRCUIT

2008 MAR -7 PM 4: 03

FILING DEPOSITORY

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**MICHIGAN GAMBLING OPPOSITION ("MichGO"),**
**a Michigan non-profit corporation**
**Plaintiff-Appellant,**

v.

**DIRK KEMPTHORNE, in his official capacity as SECRETARY OF THE**
**UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.***
**Defendants-Appellees,**

---

**MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS,**
**Intervenor Defendant-Appellee.**

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**DOCKET NO. 05-01181**
**THE HONORABLE JOHN GARRETT PENN**

---

**MOTION OF PLAINTIFF-APPELLANT TO SUPPLEMENT ISSUES**
**PRESENTED FOR REVIEW**

**Attorneys for Plaintiff:**
**Rebecca A. Womeldorf (452034)**
**SPRIGGS & HOLLINGSWORTH**
**1350 I Street, NW Suite 900**
**Washington, D.C. 20005**
**Telephone: (202) 898-5800**

Dated: March 7, 2008

**Daniel P. Ettinger**
**Joseph A. Kuiper**
**John J. Bursch**
**WARNER NORCROSS & JUDD LLP**
**111 Lyon St., NW, Suite 900**
**Grand Rapids, Michigan 49503**
**Telephone: (616) 752-2000**

ALL-STATE LEGAL®

**EXHIBIT**

C

## INTRODUCTION

Plaintiff-Appellant Michigan Gambling Opposition ("MichGO") submits this Motion to notify this Court of the United States Supreme Court's decision to grant certiorari in *Carcieri v. Kempthorne*, __ S. Ct. __, 2008 WL 482033 (Feb. 25, 2008), and to request that one of the questions presented in *Carcieri* be added to the issues presented for review in this Court.

As explained below, the United States Supreme Court's merits decision in *Carcieri* may be dispositive of the primary dispute underlying this appeal: whether Defendants-Appellees Department of Interior ("DOI") and Bureau of Indian Affairs ("BIA") (collectively, "Defendants") may take land in trust for Intervenor Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (the "Gun Lake Band," or simply, the "Band"). One of the two questions the Supreme Court will address in *Carcieri* is whether the Indian Reorganization Act of 1934 ("IRA") empowers the Secretary of the Interior to take land in trust for Indian tribes that were not federally recognized in 1934, when IRA was enacted. *See Carcieri* Pet. for Writ of Cert. at i (attached as **Exhibit A**). The Gun Lake Band was <u>not</u> federally recognized in 1934, as the administrative record demonstrates. If the Supreme Court answers the question presented to it in the negative, that decision will be a change in law that binds this Court and the parties, even though the issue was not

1

raised in previous briefing.   Accordingly, Plaintiff respectfully requests leave to supplement the issues presented to this Court for review.

## ARGUMENT

**I.    The issue presented in *Carcieri* is dispositive of the present litigation.**

On February 25, 2008, the United States Supreme Court granted certiorari to review the First Circuit's *en banc* decision in *Carcieri v. Norton*, 497 F.3d 15 (1st Cir. 2007), in which the First Circuit upheld the Secretary's decision under IRA to take approximately 30 acres of land in trust in Rhode Island for the benefit of the Narragansett Tribe, even though the tribe had not been federally recognized as an Indian tribe at the time of IRA's enactment in 1934.  *See id.* at 22.   The First Circuit held that IRA's definition of eligible "Indian" tribes – namely, those "recognized [as] Indian tribe[s] *now* under Federal jurisdiction," 25 U.S.C. § 479 (emphasis added) – was ambiguous, and thus the Secretary's interpretation was entitled to *Chevron* deference.  *See id.*  Applying that deference, the court held that the Secretary had reasonably interpreted IRA to require only that a tribe be federally recognized at the time of the relevant land-in-trust application, and not at the time of IRA's enactment. *See id.*

The Supreme Court granted certiorari to decide "[w]hether the 1934 Act empowers the Secretary to take land into trust for Indian tribes that were not

recognized and under federal jurisdiction in 1934." *Carcieri* Pet. for Writ of Cert. at i.

If the Supreme Court rules in Rhode Island's favor on this question, the decision will be dispositive here because it is undisputed that the Gun Lake Band lost its federal recognition long before enactment of IRA. BIA determined that the Band's federal acknowledgement ceased in 1870, when the Band decided to discontinue its compliance with the Treaty of 1855 by moving from Oceana County to Allegan County and received its last annuity-commutation payment. *See* 62 Fed. Reg. 38,113 (1997) ("The date of the band's final annuity commutation payment, 1870, has been used as the date of the latest Federal acknowledgement for purposes of this finding to enable the petitioner to proceed under the provisions of section 83.8."). As the Gun Lake Band explains in its appeal brief, "the federal government withheld formal acknowledgement beginning in 1870. . . . Thus, for well over a century, the Tribe was denied both federal recognition and reservation lands on which it could pursue communal self-determination and self-sufficiency." (Br. for Def.-Appellee Match-E-Be-Nash-She Wish Band of Pottawatomi Indians at 3 (citing J.A. 1772); *see also id.* at 42 (stating that the Tribe "was not federally recognized and had no reservation when IGRA was enacted [in 1988]"); Answering Br. of Defs.-Appellees at 12 & n.3 (describing the Band's attempts, beginning in 1992, to seek acknowledgement, and

noting that only tribes "not currently acknowledged by Interior" can do so)). The Gun Lake Band unequivocally states in its brief that it was not federally recognized until August 23, 1999. (*Id.* at 3.)

Accordingly, a favorable ruling in *Carcieri* dooms the land-in-trust application that is at the heart of the present dispute.

## II.  Any change in law rendered by the United States Supreme Court must be applied to this pending case.

A federal Court of Appeals must "apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. Sch. Bd. of City of Richmond*, 416 U.S. 696, 711 (1974). Accordingly, it is proper for this Court to take notice of intervening changes in the law, whether by statute or judicial decision. *See id.*; *Vandenbark v. Owens-Illinois Glass Co.*, 311 U.S. 538, 543 (1941); *Schaff v. R.W. Claxton, Inc.*, 144 F.2d 532, 533 (D.C. Cir. 1944). In addition, federal Courts of Appeals may consider issues not raised in the parties' briefs or oral argument in such an instance, especially "when the decision affects the broad public interest." *Consumers Union of United States, Inc. v. Fed. Power Comm'n*, 510 F.2d 656, 662 (D.C. Cir. 1975).

If the United States Supreme Court decides the first question presented in *Carcieri* in favor of Rhode Island, the decision will effect an intervening change in law concerning the Secretary's power to take land in trust on behalf of Indian

4

tribes, like the Gun Lake Band, that were not federally recognized in 1934. Furthermore, such a decision would manifestly "affect[] the broad public interest," as the First Circuit itself recognized in its opinion, and as evidenced by the *amicus* brief filed in support of Rhode Island and joined by 16 States. *See Carcieri*, 497 F.3d at 21 n.2 ("The State's challenges to the Secretary's authority under the IRA and the Constitution have national implications that reach beyond Rhode Island."); Brief of the States of Alabama, Alaska, Arkansas, Connecticut, Florida, Idaho, Illinois, Iowa, Kansas, Massachusetts, Missouri, North Dakota, Oklahoma, Pennsylvania, South Dakota, and Utah as Amici Curiae in Support of the Petitioners (hereinafter, "*States' Amicus Brief*"), in *Carcieri v. Kempthorne*, No. 07-526, 2007 WL 4178495, at *1 (Nov. 21, 2007) (attached as **Exhibit B**) (explaining the States' "vital interest" in the First Circuit's decision, which "grant[ed] the Secretary . . . unfettered discretion to take land within any State into trust 'for Indians'" in creating "an area largely controlled by a competing sovereign within a State's borders without its consent").[1]

The addition of the *Carcieri* issue will not prejudice Defendants. The issue does not require additional factual development or briefing, because Defendants have already concluded that the Gun Lake Band was not federally recognized in

---

[1] These States as *amici* also urged the Supreme Court to review and reverse the First Circuit's decision with respect to Rhode Island's nondelegation claim. *See States' Amicus Brief*, at 18-23.

1934. And if the Supreme Court reverses, MichGO is entitled to the benefit of that change in law under well-settled precedent, *see Bradley*, 416 U.S. at 711; *Vandenbark*, 311 U.S. at 543; *Schaff*, 144 F.2d at 533; *Consumers Union*, 510 F.2d at 662, and the parties' dispute will be resolved. Conversely, denying MichGO's motion would substantially prejudice MichGO, as a favorable Supreme Court decision in *Carcieri* will be dispositive in this case, and the failure to apply that law affects the public interest.

## CONCLUSION

For the foregoing reasons, MichGO respectfully requests that it be permitted to supplement its Statement of Issues Presented for Review by adding the following question:

> Whether the Indian Reorganization Act of 1934 empowers the Secretary to take land into trust for the Gun Lake Band, when the Band was not recognized and under federal jurisdiction in 1934.

If the Court would like additional argument from the parties on this issue, MichGO respectfully requests that this Court set an abbreviated, supplemental briefing schedule to do so.

6

Dated: March 7, 2008

Respectfully submitted,

Rebecca A. Womeldorf (452034)
SPRIGGS & HOLLINGSWORTH
Attorneys for Plaintiff
1350 I Street, NW Suite 900
Washington, D.C. 20005
Telephone: (202) 898-5800
Facsimile: (202) 682-1639

Daniel P. Ettinger
Joseph A. Kuiper
John J. Bursch
WARNER NORCROSS & JUDD LLP
Attorneys for Plaintiff
900 Fifth Third Center
111 Lyon Street, NW
Grand Rapids, Michigan 49503

1515090

7

## CERTIFICATE OF SERVICE

I certify that on March 7, 2008, I filed the above document with the Clerk of the Court and served the counsel listed below by first class mail.

Aaron P. Avila
UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 23795, L'Enfant Plaza Station
Washington, DC 20026
*Counsel for Federal Defendants/Appellees Dirk Kempthorne, et al.*

Seth P. Waxman
Edward C. DuMont
WILMER, CUTLER, PICKERING, HALE AND DORR, LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
*Counsel for Intervenor/Defendant-Appellee Match-E-Be-Nash-She Wish Band of Indians*

Conly J. Schulte
FREDERICKS & PEEBLES, LLP
3610 North 163rd Plaza
Omaha, NE 68116
*Counsel for Intervenor/Defendant-Appellee Match-E-Be-Nash-She Wish Band of Indians*

Nicholas Yost
Sonnenschein Nath & Rosenthal, LLP
685 Market Street, 6th Floor
San Francisco, CA 94105
*Counsel for Intervenor/Defendant-Appellee Match-E-Be-Nash-She Wish Band of Indians*

Elizabeth Lohah Homer
Homer Law, Chartered
1730 Rhode Island Avenue, NW, Suite 501
Washington, DC 20036
*Counsel for Amici Allegan Chamber of Commerce, Barry County Chamber of Commerce, Deputy Sheriff's Association of Michigan, Friends of the Gun Lake Indians, Wayland Township, and Kalamazoo Regional Chamber of Commerce*

Rebecca A. Womeldorf

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 07-5092**                               **September Term 2007**

05cv01181

**Filed On:** March 19, 2008

Michigan Gambling Opposition, A Michigan
Non-profit Corporation,

      Appellant

      v.

Dirk Kempthorne, In his official capacity as
Secretary of the United States Department of
the Interior, et al., et al.,

      Appellees

> UNITED STATES COURT OF APPEALS
> FOR DISTRICT OF COLUMBIA CIRCUIT
>
> FILED   MAR 1 9 2008
>
> **CLERK**

**BEFORE:**   Ginsburg, Rogers and Brown, *Circuit Judges*

## O R D E R

Upon consideration of appellant's motion to supplement the issues presented for review, and the oppositions and reply thereto, it is

**ORDERED** that the motion be denied.

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:     /s/
Cheri Carter
Deputy Clerk

EXHIBIT
D
ALL-STATE LEGAL®

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 07-5092**

**September Term 2007**

**05cv01181**

**Filed On:** July 25, 2008

Michigan Gambling Opposition, A Michigan
Non-profit Corporation,

      Appellant

      v.

Dirk Kempthorne, In his official capacity as
Secretary of the United States Department of
the Interior, et al., et al.,

      Appellees

**BEFORE:**    Sentelle,* Chief Judge, and Ginsburg, Henderson, Randolph,
Rogers, Tatel, Garland, Brown,* Griffith,* and Kavanaugh,
Circuit Judges

## O R D E R

    Appellant's petition for rehearing en banc and the response thereto were
circulated to the full court, and a vote was requested. Thereafter, a majority of the
judges eligible to participate did not vote in favor of the petition. Upon consideration of
the foregoing, it is

    **ORDERED** that the petition be denied.

                              **FOR THE COURT:**
                              Mark J. Langer, Clerk

               BY:    /s/
                              Michael C. McGrail
                              Deputy Clerk

* Chief Judge Sentelle, and Circuit Judges Brown and Griffith would grant the petition.

A True copy:



United States Court of Appeals
for the District of Columbia Circuit

By:

**EXHIBIT**

E

casino would be detrimental to the community, we petition the elected township, county, state and federal officials to actively oppose the construction of such a gambling casino anywhere in West Michigan and to initiate whatever legal actions are needed to stop such a construction."

| DATE | SIGN NAME | PRINT NAME | ADDRESS | TOWNSHIP | CITY |
|---|---|---|---|---|---|
| 2/21/0-1 | Kathleen Wall | Kathleen I. Wall | 10040 Byron Center Ave | Byron | Byron Center |
| 3/1/01 | Ida Gemmen | Ida Gemmen | 1901 Goldeneye | Park | Holland |
| 3/1/01 | Brian DeYoung | Brian De Young | 849 Knoll Dr. | Zeeland | Zeeland |
| 3/1/01 | Don Giesmann | Don Giesmann | 344 E 146 Rd | Ash | Carleton |
| 3 feb | Dave Patchel | Dave Patchel | 2721 69th St | Wayland | Shelbyville |
| 3/8/01 | Ken Blaauw | Ken Blaauw | 2874 13th St | Hopkins | Shelbyville |
| 3/9/01 | Henry Blaauw | Henry Blaauw | 1920 13th St | Hopkins | Shelbyville |
| 3/8/01 | Barbara Wendroff | Barbara Wendroff | 2080 100th Ave | Hopkins | Hopkins |
| 3/8/01 | Charles Wendroff | Charles Wendroff | 2080 13th Ave | Hopkins | Hopkins |

**EXHIBIT**

F

ALL-STATE LEGAL®

casino would be detrimental to the community, we petition the elected township, county, state and federal officials to actively oppose the construction of such a gambling casino anywhere in West Michigan and to initiate whatever legal actions are needed to stop such a construction."

| DATE | SIGN NAME | PRINT NAME | ADDRESS | TOWNSHIP | CITY |
|---|---|---|---|---|---|
| 3-25-01 | *(signature)* | Joan Velting | 8048 Stickley | Cascade | Grand Rapids |
| 3-25-01 | *(signature)* | Dave Velting | 8048 Stickley | Cascade | Grand Rapids |
| 3/1/01 | *(signature)* | Corey M. Williams | 4152 42nd Sw | OTTAWA | GRANDVILLE |
| 3/1/01 | *(signature)* | Rae Heckelhman | 955 Bayou SW | Byron | GR |
| 3-4-01 | *(signature)* | David Keith | 7492 Trustee | Georgetown | Jenison |
| 3-4-01 | *(signature)* | BOB VANDER WOUDE | 747 AMBERWOOD SW | | C.R. |
| 3/4/01 | *(signature)* | LANE ANKERAND | 3488 34TH STREET | MONTEREY | Hopkins |
| 3/4/01 | *(signature)* | Marianne Heuerman | 4335 4th Ave | Leighton | Wayland |
| 3-1-01 | *(signature)* | Al Heuerman | " | " | " |
| 3/4/01 | *(signature)* | PHILIP R. BARBER | 4500 SETTAWE NE | PLAINFIELD | ROCKFORD |
| 3/1/01 | *(signature)* | | | | |
| 3/4/01 | *(signature)* | Betty K Barber | 4500 Settawe | Plainfield | Rockford |
| 3/4/01 | *(signature)* | Joey Molina | 3102 Byron Center 12 | SW | Wyoming |
| 3/4/01 | *(signature)* | Debbie Meier | 3320 Allen St | | Hudsonville |
| 3/4/01 | *(signature)* | Dennis J. De Zwaan | 855 60th | | GR/By Ctr. |
| 3/4/01 | *(signature)* | Diane M. De Zwaan | 855 60th St Sec. | Byron | Byron Ctr. |
| 3-4-01 | *(signature)* | Doug Velting | 2610 Pine Dunes Dr. | Wyoming | Wyoming |
| 3-4-01 | *(signature)* | ERWIN M. REGISTER | 3910 RAVINE Dr. | ALLENDALE | ALLENDALE |
| 3-4/01 | *(signature)* | CAROLYN MOORE | 1544 Greenly | | Hudsonville |
| 3-4-01 | *(signature)* | LORRAINE WAINBRIDGE | 611 Hagen Trk. | | |
| | | | | | |
| | | | | | |
| | | | | | |

WITNESSED BY: *(signature)*

2013



| Research & Polling | Media | Communication | Supporters | Show Your Support! | Contact Us |

**Click here to learn about the Detroit Free Press investigation**

### Thank you for visiting 23isenough.org!

"23 is Enough" Political Action Committee is a group of business and community leaders in Michigan who are opposed to the expansion of casinos in Michigan. Michigan is well on its way to becoming the "Las Vegas" of the Midwest, with more than 20 casinos now in operation. Compacts have also been approved for three more casinos, tentatively planned for Battle Creek, Romulus, and New Buffalo (not yet in operation). This is a running total of 23 casinos (pdf html), placing Michigan among the top four states in the country for the most number of casinos—and these numbers do not even include the proposed Gun Lake/Allegan casino and several others being contemplated.

Much has happened in the fight against casino expansion. Click here to view a Summary of Michigan Tribal and Commercial Gaming Issues (pdf) and Mike Jandernoa's February 2007 Letter to Michigan Lawmakers (pdf).

To learn more about *23 is Enough* and how to *Stop Casino Expansion in Michigan*, please call:

(616) 235-9380

The Michigan Casino Map is in Adobe PDF format. You will need Acrobat Reader to view this file.
Click here to download Acrobat Reader from adobe.com

EXHIBIT
G
ALL-STATE LEGAL®

http://www.23-is-enough.com/



## We Support **23 is Enough!**

Richard M. DeVos, *Honorary Chair*
Michael Jandernoa, *Chair*
State Senator Bill Hardiman
State Senator Alan Cropsey
State Senator Wayne Kuipers
State Senator Jerry Van Woerkom
State Senator Patricia Birkholz
Representative Jerry Koolman
Representative Glenn Steil Jr.
Representative Dave Hildenbrand
Representative Jack Hoogendyke
Representative Tom Pearce
Representative David Farhat
Representative Fulton Sheen
Representative Michael Sak
Representative William VanRegenmorter
Representative Gary Newell
Representative Barb VanderVeen
Representative Bill Huizenga
Wayland Twp. Trustee Dave Patchak
Eric Adamy
Dean Agee
Martin Allen
John Baab
Daniel Barcheski
William Battjes
Bill Beckman
Edward Berends
Robert Bernecker
Mathew Bissell
Dirk Bloemendaal
Todd Boorsma
Susan Boorsma
Tammy Born
Robert Boylen
John Brann
Michael Brann
Tommy Brann
David Brenner
Scott Brinkmeyer
Jim Buck
Donald Buske
Gaylen Byker
William Bylenga
John Canepa
David Cassard
Jason Chatman
Curt Christensen
Thomas Church
Michael Cole
Robert Coleman

Carrie Irwin
Nicholas Irwin
Robert Israels
Don Jandernoa
Sue Jandernoa
Marin John
Jessie Jones
Joseph Jones
Michael Jullen
Ronald Kaes
Fred & Linn Keller
Raymond Kisor
Herbert Knape
Ben Landheer
Larry Leigh
Jamie Lindeman
John D. Loeks
John Logie
Cynthia Longchamps
Arend Lubbers
Don & Nancy Lubbers
Donald Maine
Eric Maxey
James McKay
Brian Meeter
David Mehney
Rusty Merchant
Christian Meyer
Bonnie Miller
Matthew Missad
Terrence Moore
David Morren
Mark Muller
Cecily Near
Shannon Near
Elizabeth Nickels
Tim O'Donovan
Vern Ohlman
Christos Panopoulos
Patrick Patton
Richard Pe'ay, Jr.
Dick Posthumus
Elsa Prince-Broekhuizen
Anthony Prusinski
Gene Proctor
Edward Pylman
Robert Rachelle
Sharron Reynolds
David Rice
Harold Rodenhouse
Rex Rogers

Peter Cook
Bruce Courtade
Sam Cummings
William Currie
Meg Cusak
Robert Dean
Jennifer Delessio
Daniel DeVos
Doug DeVos
Richard DeVos Jr.
Daniel DeWitt
Jack DeWitt
Tom Doyle
James Dykema
Larry Erhardt
James Ertl
Robert Fairman
Thomas Fehsenfeld
Myles Fish
Brain Fleetham
Larry Fredricks
David Frey
William Fulkerson
Harvey Gainey
Joseph Gavan
David Gibbons
Michael Glenn
George & Barbara Gordon
Donald Goris
Gary Granger
Howard Haan
James Hackett
Clova Hardiman
Bryan Harrison
Karl Hascall
Arthur & Betsy Hasse
Ralph Hauenstein
Dick Haworth
Robert Hendricks
Daniel Hibma
William Hineline
Ken Hoeksum
R. Stuart Hoffius
Mary Hollinrake
Earl & Donnalee Holton
Rachel Hood
Bob & Judy Hooker
David & Leslie Hooker
J.C. Huizenga
William Idema
Benjamin Irwin

Richard Root
Robert Roth
Charles Royce
Chuck & Stella Royce
Jeffrey Schreur
Kimberly Schuiling
Mark Schut
Cheryl Schut
George Sharpe
Thomas Shearer
Cheryl Sheen
Budge Sherwood
Jeffrey Sluggett
Dana Sommers
John Spoelhof
Chuck Stoddard
Gladys Stringham
James Stringham
Keri Suszek
Art Tanis
Craig Tiggelman
Roosevelt Tillman
Gordon Toering
Jerry Tubergen
Stephen Turner
David VanAndel
Barbara VanderVeen
Kent VanderWood
Michelle VanDyke
Lewis Vankulken
Mike Volkema
Harold Voorhees
Peter Wege
John Wheeler
Jim White
Dave Willerup
Rita Williams
Casey Wondergem
Richard & Barbara Young
Kurt Yost

**The following organizations have public positions opposing the proposed Gun Lake Tribal Casino:**
**Grand Rapids Area Chamber of Commerce**
**Southwest Michigan First**
**Kalamazoo Economic Development Corporaton**
**Allegan Farm Bureau**
**Grand Action**
**Grand Rapids Downtown Development Authority**

**MIRS News**

**June 13, 2005**

**MichGO Sues To Stop Gun Lake Casino**

As reported Friday in *MIRS*, a group opposing the establishment of a Gun Lake Casino filed a lawsuit today against the federal government challenging the Bureau of Indian Affairs' decision to take land-in-trust for the Gun Lake Band of Potawatomi Indians.

Technically, the name of the group that filed the suit was the Allegan County-based Michigan Gambling Opposition (MichGO), which apparently works in conjunction with "23 Is Enough."

Details of the lawsuit were presented this morning at a news conference at the Wobma Farm in Wayland, where local farmer Gloria **WOBNA** kicked-off the event with a speech outlining her objections to the proposed casino.

"My husband and I chose to raise our family and keep our farm here because of the quiet, pristine, rural character of the area," Wobma said. "If this proposed casino monstrosity is built, the fundamental fabric and quality of life in our Wayland community will be destroyed and changed forever."

Proponents of the casino have pointed out that such lawsuits have successfully delayed casino projects in the past (such as the one at New Buffalo), but, in the final analysis, may not succeed in stopping them.



EXHIBIT

H



**Everything Michigan**



THE GRAND RAPIDS

# PRESS

## Gun Lake tribe another step closer to casino

Saturday, February 24, 2007
**The Grand Rapids Press**

WAYLAND TOWNSHIP A U.S. district judge has cleared the way for a local casino, unless there are additional appeals.

The ruling dismissed four claims by a group calling itself MichGO, or Michigan Gambling Opposition, which sought an injunction against the federal governments plan to put land in trust for the tribe.

U.S. District Judge John Penn late Friday ruled in favor of the Department of the Interior, writing "the plaintiff (MichGo) has raised no genuine issues of material fact."

Once the land is in trust, the tribe can proceed with its plans to build the casino on 146 acres just off U.S. 131 in Wayland Township.

While tribe officials said they anticipate an appeal, they called the ruling a significant step.

This decision is a cause for great celebration, both for the tribe and the people of West Michigan who dream of economic opportunities and good paying jobs with great benefits, said D.K. Sprague, tribal chairman.

The tribe has projected the casino will create 1,800 direct jobs and another 3,100 indirect jobs.

The 304-member tribe said the tens of millions of dollars the facility will generate each year will pay for education, housing, elder care, cultural preservation and other badly needed services.

MichGO got its financial backing from the leaders of 23 is Enough, a lobbying group formed by Grand Rapids business leaders hoping to freeze casino growth in Michigan.

Both anti-casino groups have said they believe a casino will be an economic drain, unfairly competing with existing entertainment options, increasing crime and hurting families.

**For more on this story, return to MLive.com on Sunday or pick up a copy of Sunday's Grand Rapids Press.**

©2007 Grand Rapids Press
© 2007 Michigan Live. All Rights Reserved.



EXHIBIT

I

ALL-STATE LEGAL®



**Everything Michigan**



# Tribe declares victory for Wayland Twp. casino

Sunday, February 25, 2007
**By Paul R. Kopenkoskey**

**The Grand Rapids Press**

WAYLAND -- Nine days before the government plans to place 146 acres into trust for them, the Gun Lake Tribe is celebrating a judge's ruling that clears the way for a casino in Wayland Township.

But an anti-gambling group said plans to hear the ding of slot machines are premature.

Tribe officials Saturday said they're eager to proceed with construction after U.S. District Judge John Penn rejected all four counts of a lawsuit that Michigan Gambling Opposition (MichGo) filed in 2005 to block the Department of Interior from placing land into trust for the tribe.

Penn, of the Washington D.C., district, ruled that MichGo did not prove its claims:

• That the land does not fit the classification of a reservation.

• That the department violated the National Environmental Policy Act by failing to issue an environmental impact statement.

• That the tribe does not qualify for gaming.

• That the tribe does not have constitutional authority to acquire land in trust.

The ruling, unless overturned on appeal, allows the government to approve the trust. It previously said it would do that March 5. Under the trust, the government holds title to the land, and the tribe has sovereignty to operate a casino.

However, Dorr-based MichGO (Michigan Gambling Opposition) will file a motion to block the action pending appeal, President Todd Boorsma said Saturday.

"We will continue to pursue every possible legal and legislative avenue to uphold our state's right to stop this unwanted casino," he said.

The Gun Lake Tribe, also known as Match-e-be-nash-she-wish Band of Pottawatomi, is seeking a gaming compact with the state.

It intends to open a 193,424-square foot complex in early 2008, said spokesman James Nye. Amenities include a 98,879-square-foot gaming area, two restaurants, two fast food outlets, a sports bar and entertainment lounge.

"We anticipate breaking ground in 45 to 60 days from the date the land goes into trust," said D.K. Sprague, tribal chairman. "If we can get the land in trust, we're definitely moving ahead."



With a lagging state economy, Sprague said, the casino will infuse Allegan County with 1,800 new jobs. Plans are to convert the former Ampro factory into a casino and entertainment venue with card games and thousands of slot machines.

"It would bring economic self sufficiency for the tribe," he said.

Sprague added the tribe is girding for another legal go-round with MichGO but is confident it will prevail.

"Their opposition is based on economics," he said.

That's one area both sides agree on but draw different conclusions from, said John Helmholdt, a spokesman for MichGO and 23 Is Enough, an anti-casino lobbying group.

An Indian casino doesn't operate on a level playing field, Helmholdt said.

If it opens, expect to see existing area restaurants and convention centers struggle to stay open, he said.

"Competition is good if it's an even playing field," Helmholdt said.

"In this instance, it's not a fair playing field. It's a sovereign nation where the vast majority of taxes are not paid, and they're not subject to the same health inspections. It gives them a huge leg up," he said, at the expense of entrepreneurs in Grand Rapids, Holland, Ionia, Barry County and Kalamazoo.

There are 17 tribal casinos and three commercial casinos in Michigan, according to MichGO.

©2007 Grand Rapids Press

© 2007 Michigan Live. All Rights Reserved.



# MichGO

### *Informing Communities About*
### *the Effects of Casino Gambling*

P.O. Box 67, Moline, Michigan 49335-0067
Phone: 616.893.3739  E-mail: boorsmatodd@aol.com
www.michgo.com

Officers and Boards

Todd Boorsma: President
MichGO PAC
MichGO Education Fund

Jim Stringham:
   Vice President/Treasurer
   Vice President Research
MichGO PAC
MichGO Education Fund

Sue Boorsma: Secretary
MichGO PAC
MichGO Education Fund

MichGO PAC
   Bobbie Holmes
   Stuart Isenhoff

MichGO Education Fund
   Missy Bouwman
   Randy Ellens
   Richard Helderop
   Gloria Wobma

Board of Reference

Gary Granger
   President, Granger Group
Mark Jansen
   Former State Representative
Lyle Labardee
   President, Crisis Care Network
Rusty Merchant
   McAlvey & Associates
Dr. Rex Rogers
   President, Cornerstone University
Fulton Sheen
   State Representative
Don Westhouse
   Westhouse Home Improvement

September 2005

Dear MichGO Member:

As we wind down another beautiful summer in West Michigan, I would like to take a minute to tell you about MichGO's ongoing efforts to block the proposed casino in Allegan County. As you may know, MichGO filed suit against the U.S. Bureau of Indian Affairs (BIA) in June to demand a more thorough environmental impact study that will fully analyze the environmental, economic and social repercussions of the Gun Lake Band's proposed casino in Allegan County. We are currently asking the court to prevent the land from being taken into trust while the lawsuit is pending.

We believe the BIA has inaccurately concluded that the proposed Gun Lake casino would have no significant impact on our community. The BIA's assessment directly contradicts a credible third-party study commissioned by the Grand Rapids Chamber of Commerce, which found that a casino would create serious economic losses and social problems for Allegan County and the surrounding communities.

We do not know when a decision will be made, but we will keep you up-to-date of the latest developments. In the meantime, MichGO continues to urge Governor Granholm not to sign a compact with the Gun Lake Band.

But we cannot do it alone. This case is so important and the time is so critical. We are doing everything we can to preserve the character and quality of our communities and we know you share our same concerns. Please help us stop the destructive repercussions of casino gambling by taking action.

- ✓ Action #1. Ask your pastor to put a message about your concerns on your prayer line and in your church newsletters. Ask your Pastor and Elder Board to speak out on this issue.
- ✓ Action #2. Write Governor Granholm and ask her to ***not*** sign a compact with the Gun Lake Tribe. Mailing information is on the reverse side of this letter
- ✓ Action #3. Send your financial donation to MichGO using the enclosed card.

We could not have been successful so far in keeping a casino out of Allegan County without your support. Please continue your support by sending donations to the address shown on the enclosed card. For a limited time for a donation of $30.00 or more, we will send you a copy of Dr. Rex Rogers' newest book, *Gambling, Don't Bet on It*. See the enclosed excerpt from this book. Dr. Rogers is a member of our Board of Reference.

Thank you!

Sincerely,

Todd Boorsma

EXHIBIT
K
ALL-STATE LEGAL®




### Department of State — Michigan.gov
Terri Lynn Land, Secretary of State

...Michigan.gov Home     ...SOS Home  |  Elections in Michigan Home  |  Contact SOS

# Campaign Contribution Search Results

*Criteria used for the search:*

- Contributor's Last Name: **"PATCHAK"**
- Contributor's First Name: **"DAVID"**

Supplemental itemizations will be shown after the original contribution, but not reflected in the match count.
Results are sorted by: **committee name** and then by: **amount-descending**

**Matches 1-1 of 1**

| Receiving Committee Name Committee ID-Type | Sched Type | Received From Address Occupation-Employer | City State Zip | Date | Amount | Cumul |
|---|---|---|---|---|---|---|
| TODD BOORSMA FOR STATE REP COMM 513737-CAN | DIRECT | *DAVID PATCHAK* 2721 6TH STREET | SHELBYVILLE MI 49344-0000 | 04/18/08 | $50.00 | $50.00 |

**Matches 1-1 of 1**

[Campaign Finance On-Line] [Expenditure Analysis] [Previous Search]

Michigan.gov Home  |  SOS Home  |  Elections in Michigan Home  |  State Web Sites
Privacy Policy  |  Link Policy  |  Accessibility Policy  |  Security Policy
Copyright © 2002 State of Michigan

/cgi-bin/cfr/contrib_anls_res.cgi
August 22, 2007



EXHIBIT

ALL-STATE LEGAL®





# ✓ote

## Dave Patchak
### Wayland Township Supervisor

EXPERIENCE:
- ✓ 10 years on Planning Commission
- ✓ Elected to Board in 2004
- ✓ 2 Years on Road Committee
- ✓ 2 Years Allegan County Brownfield Authority



**Vote for Experience**

Paid for by Dave Patchak for
Wayland Township Supervisor
2721 6th St, Shelbyville, MI 49344
with regulated funds.

WAY
FOOTB

Saturday, Aug
11:00 an
*In front*

EXHIBIT

M

ALL-STATE LEGAL®

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHIGAN GAMBLING OPPOSITION )
("MichGO"), a Michigan non-profit )
corporation, )
           )
          Plaintiff, )    Case No.  1:05-CV-01181-JGP
           )
v. )
           )
GALE A. NORTON, in her official capacity )
as United States Secretary of Interior, )
Department of Interior, et al., )
           )
          Defendants, )
————————————————————— )
           )
MATCH-E-BE-NASH-SHE-WISH BAND )
OF POTTAWATOMI INDIANS, a federally- )
recognized Indian Tribe, )
           )
          Intervenor. )
————————————————————— )

## JOINT AMICUS CURIAE BRIEF OF
## WAYLAND TOWNSHIP, DEPUTY SHERIFF'S ASSOCIATION OF MICHIGAN, BARRY COUNTY CHAMBER OF COMMERCE, AND FRIENDS OF THE GUN LAKE INDIANS

**EXHIBIT A**



## INTRODUCTION

The Wayland Township, Deputy Sheriff's Association of Michigan, Barry County Chamber of Commerce, and Friends of the Gun Lake Indians (collectively referred to as "Amicus Movants") have moved for leave to file an *amicus curiae* brief in support of the decision of the Secretary of Interior (the "Secretary") to take a parcel of land into trust for the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians ("Tribe" or "Gun Lake Tribe").

The Gun Lake Tribe has asked the Secretary to accept the parcel of land into trust for the purpose of operating a gaming facility thereon. The Amicus Movants support the Gun Lake Tribe's proposed gaming facility because it will infuse much needed growth into the economically depressed area of Wayland Township, as well as the surrounding communities and region. Unlike many of MichGO's members (and other opponents of the Tribe's project) who appear to be located in Grand Rapids (which is over twenty miles away from the site of the proposed facility), these Amicus Movants are comprised of individuals who reside in the immediate vicinity of the proposed gaming facility. Thus, these Amicus Movants are the individuals whose environment will be most intimately affected by the facility (as opposed to many of MichGO's members who may be indirect or direct competitors of the Gun Lake Tribe's gaming facility and, accordingly, appear to be concerned about the project from a competitive standpoint). The Amicus Movants also support the Tribe's project because it will not have any significant impacts on the environment. The Amicus Movants have banded together to file this Joint Amicus Brief in the interest of judicial economy.

## BACKGROUND

In August 2001, the Tribe submitted a fee-to-trust application to the Secretary requesting that a 146-acre parcel of land located in Wayland Township, Allegan County, Michigan, be

taken into trust, in order to allow the Tribe to develop a gaming facility. *See* 25 U.S.C. §§ 467, 2719. In consideration of the Tribe's fee-to-trust application, the Bureau of Indian Affairs ("BIA") developed an Environmental Assessment ("EA") evaluating the proposed trust acquisition and gaming project pursuant to the National Environmental Protection Act ("NEPA"). The BIA published its draft EA on November 26, 2002 for a seventy-five day public comment period, during which certain of the Amicus Movants submitted numerous comment letters in support of the Tribe's project. (Administrative Record[1] ("AR") at 834; 886; 942.) The BIA thereafter published its final EA in December 2003, concluding that the proposed action posed no significant impact to the environment. Finally, on April 18, 2005, the Secretary formally decided to take the land into trust, and published that decision in the Federal Register on May 13, 2005. *See* 70 Fed. Reg. 25, 596-97 (May 13, 2005).

### THE MOVANTS' INTEREST

The Amicus Movants support the Gun Lake Tribe's project and believe the project will benefit the southwest region of the State of Michigan and its citizens. The Amicus Movants have an acute interest in the community, region and environment surrounding the proposed facility, which are at issue in this litigation. Their participation in this action is important, as it will provide the Court with an accurate depiction of the geographical and economical nature of the surrounding area. The Amicus Movants will also clarify for the Court the significant amount of local support for the Tribe's project. Specifically, the Amicus Movants are in a unique position to respond to MichGO's various claims regarding the alleged impacts of the proposed casino on the surrounding area, including: "an irreversible change in the rural character of the area;" "loss of enjoyment of the aesthetic and environmental qualities of the agricultural land

---

[1]   The Administrative Record ("AR") cites are to the administrative record filed by the Defendants in this case on November 18, 2005.

3

surrounding the casino site;" "diversion of police, fire, and emergency medical resources;" "the loss of business and recreational opportunities, such as retail stores and restaurants, that will be forced out by the casino;" "loss of tax revenue currently generated;" and "loss of consumer spending at area businesses." (Compl. ¶ 14.)

## I. Governmental Support for the Gun Lake Tribe's Project

Amicus Movant Wayland Township (the "local government") is a strong supporter of the Gun Lake Tribe's project and is well-suited to provide the Court with information regarding the character of the area, the potential impact on local businesses, the alleged loss of tax revenue, and the alleged negative diversion of police, fire and emergency medical services.

### A. The Geographic Area Surrounding the Proposed Casino Site

As set forth in the BIA's EA, the proposed gaming facility will be located in Wayland Township, Allegan County, in southwest Michigan, and will primarily be housed in an existing, single-story industrial building. (AR 36-39.) Contrary to MichGO's assertions, the proposed site is not rural, and the geographic area is very well-suited for the Tribe's proposed gaming facility for the following reasons.

The 146-acre parcel is located in an area that is currently zoned "light industrial" and is largely developed (including a pre-existing approximately 193,000-square-foot manufacturing plant located on the 146-acre parcel). (AR 36-38.) The site is bordered by 130th Avenue to the north, Norfolk Southern railroad tracks to the east, 129th Avenue to the south, and US-131 to the west. (AR 36.) East of the railroad tracks is a seed and landscape supply company and a small timber company, and located south of 129th Avenue is a transportation/freight company. (*Id.*)

The gaming facility is also in accord with the Wayland Township Zoning Ordinance and Wayland Township Land Use Plan, which states that the area surrounding the 146-acre parcel is

"logical for industrial growth given the access from US-131, the existing industrial uses and zoning the area as well as the industrial use being proposed in adjacent City of Wayland." (Wayland Township Master Plan 2002 at 4-5 (attached hereto).)  Moreover, the Tribe has consistently complied with Wayland Township's local laws, including zoning and land use restrictions. (AR 886.)

A review of the EA demonstrates that the Tribe has made every effort to respect the environment surrounding the gaming facility.  For example, the preferred alternative would not directly impact any wetlands (AR 90); no state or federally listed sensitive plants or wildlife species have been, or are expected to be, found at the site (AR 92); and no significant historical resources will be affected (AR 94).  In the words of several local community members of the commenting public, the site is "compatible" with, and indeed, "well-suited" for the gaming project. (AR 834; 926.)

### B.     Affect on Current and Prospective Businesses

MichGO argues that the Tribe's gaming facility should not be allowed on this parcel because it will cause a loss of business and recreational opportunities, such as retail stores and restaurants. (Compl. ¶ 14.)  MichGO's assertion is inaccurate.  In fact, it is anticipated that in addition to the direct financial benefit that the community will receive from the gaming revenues, the development of the facility will result in increased off-site spending, including spending for dining, beverages, lodging and general retail sales.  Wayland Township is not aware of any prospective businesses that would be displaced as a result of the Tribe's gaming facility, and any assertion to the contrary is pure speculation.

5

## C.   Illusory Tax Loss

MichGO also opposes the Tribe's project because of the alleged impacts on the community from lost property tax revenues.[2] (Compl. ¶ 14.) To the contrary, the Gun Lake Tribe has taken affirmative steps to compensate Wayland Township and Allegan County, the two local governments affected by acceptance of the land into trust, for any loss in tax revenue. (AR 886; 907.) Specifically, as stated in the EA, the Tribe's gaming compact includes provisions to compensate local governments for loss of revenue. (AR 188-89; 886; 907-08.) Furthermore, the Tribe has committed to provide the local governments with a minimum guaranteed payment in order to compensate them for the tax loss, even in the absence of a tribal-state compact. (AR 188-89; 886.)

## D.   Fire, Police, and Emergency Medical Services

MichGO asserts that the Court should prohibit the Secretary from accepting the 146-acre parcel of land into trust for the proposed casino because the gaming facility will divert fire, police and emergency medical resources from the community. (Compl. ¶ 7.) Again, this assertion is untrue. To the contrary, the Gun Lake Tribe has worked with local communities to enter into agreements for police, fire and emergency services in order to ensure such a reduction in service does not occur. (AR 886; 892.) On March 27, 2003, the Tribe and the City of Wayland executed a "Firefighting Services Agreement" to provide for firefighting and rescue services to the 146-acre parcel. (AR 216-24.) Also, the Board of Commissioners of Allegan County has approved a "Deputization and Service Agreement" for the proposed facility, which dispels MichGO's contention that the facility will divert police resources. (*Id.*) Also, according

---

[2]  Because the City of Wayland does not levy any property taxes or special assessments on the parcel, the City's income will not be implicated by the Secretary's acceptance of this land into trust. (AR 892.)

to the Deputy Sheriff's Association of Michigan's research, Native American casinos *do not* cost

taxpayers money (for additional law enforcement), but rather provide local law enforcement with

the funds necessary to purchase state-of-the-art equipment at no cost to taxpayers.  (AR 842.)

Finally, the Tribe has secured a letter of intent from Wayland Area Medical Services to provide

emergency medical services to the parcel.  (*Id.*)  All these agreements demonstrate the Tribe's

firm commitment to safety and ensuring that adequate resources are available for both the facility

and the surrounding community.

**II.      Associational/Organizational Support of the Tribe's Project**

The Barry County Chamber of Commerce, the Deputy Sheriff's Association of Michigan,

and the Friends of the Gun Lake Indians ("FOGLI") have also requested leave to participate

*amicus curiae* in this case in order to rebut MichGO's inaccurate portrayal of Gun Lake Tribe's

proposed project as repugnant to the community-at large.  (*See* Compl. ¶ 29.)  The Barry County

Chamber of Commerce serves as the collective voice for numerous businesses near the proposed

casino site.   The Deputy Sheriff's Association of Michigan ("DSAM") is a non-profit

corporation founded in 1978.  The DSAM is a Bipartisan legislative and training organization

dedicated to improving public safety and the professional careers of its members.  FOGLI is an

unincorporated grassroots organization with more than 10,000 members of the local community,

which was created in 2001 to support fairness to the Gun Lake Tribe and to support the Tribe's

efforts to bring a casino into Wayland Township.  These *amici* support the Tribe's project

because the gaming facility will provide the Tribe (as well as the community at large) much

needed economic assistance, as it currently struggles to provide essential services, infrastructure,

administrative facilities, and housing for its approximately 277 members, and because the project

will not cause a measurable increase in violent crimes.  (*See* AR 18; 942.)

The development of a casino will bring jobs and economic growth to the southwest region of the State of Michigan, including the Wayland Township area, thus decreasing unemployment in a state with one of the highest unemployment rates in the Country. In fact, as set forth in the EA, the proposed casino is expected to create 4,904 new jobs (directly and indirectly). (AR 94-97; *see* AR 593-711.) In addition to the obvious direct employment benefits, the project is also expected to create jobs through the employment of local vendors and the increased revenues anticipated by other local businesses catering to casino patrons and employees. (*Id.*) Such non-gaming, off-site sales are expected to be approximately $32 million dollars per year, which will decrease the elevated unemployment rate of 6.6 percent (in November 2005 (seasonally adjusted)) for the State of Michigan.[3] (*See* U.S. Bureau of Labor Statistics Mem. No. 05-2317, at http://www.bls.gov/news.release/pdf/laus.pdf; AR 57-59; 94-95.) This gaming would also decrease the Tribe's unemployment rate of around 27 percent (as noted in the EA), which is approximately four times higher than that of the State of Michigan generally.[4] (*Id.*)

Also, the agreements between the Tribe and local governments for services such as fire, police and emergency medical will benefit the community by increasing the services and protections available to local residents, as well as casino patrons. For example, the new jobs created and funded by the proposed facility include four additional Allegan County Deputy Sheriffs and one Allegan County Sergeant, helping to protect not only the new casino, but also deter already-existing criminal acts. (AR 126-29; 230-42.) This is a substantial staffing increase

---

[3] It is important to consider this information in light of the fact that 48.6% of the Allegan County residential labor force works outside of Allegan County. (*Id.*)

[4] The proposed facility would also provide the Tribe and its members with the economic support necessary to attain housing for its approximately 277 members—only 26 percent of Tribal members own their own home (compared to 82.9 percent for Allegan County generally). (AR 18.)

8

for that Department. Furthermore, contrary to MichGO's representations, the DSAM's research reveals that the Tribe's casino will <u>not</u> cause a measurable increase in violent crimes.  (AR 942.)

## CONCLUSION

In sum, the Administrative Record in this case supports the Secretary's decision to accept the 146-acre parcel of land into trust for the Gun Lake Tribe.  As the EA demonstrates, the Tribe's proposed casino will not significantly impact the human environment and, contrary to MichGO's assertions, the community overwhelmingly supports the Tribe's proposed casino.  For these reasons, the Amicus Movants support the Tribe's proposed facility and ask that the Court allow the Tribe's project to proceed.


Dated: January 18, 2006


On Behalf of Wayland Township,

By:___s/John A. Watts_____
    John A. Watts (Mich. Bar # P22048)
    Michael D. Blumeno (Mich. Bar # P66063)
    JOHN A. WATTS, P.C.
    245 Hubbard Street
    Allegan, MI 49010
    (269) 673-3547


On Behalf of Barry County Chamber of Commerce,

By:___s/Robert Byington_____
    Robert Byington (Mich. Bar # P27621)
    DEPOT LAW OFFICES PLC
    222 W. Apple Street
    Hastings, MI 49058
    (269) 945-9557


On Behalf of Friends of the Gun Lake Tribe,

By:___s/Kevin Cronin_____
    Kevin Cronin (Mich. Bar # P38915)
    2371 130th Ave.
    Hopkins, MI 49328
    (269) 793-7764


On Behalf of Deputy Sheriff's Association of Michigan,

By:___s/Thomas A. Klug_____
    Thomas A. Klug (Mich. Bar # P27462)
    LAW OFFICE OF THOMAS A. KLUG, P.C.
    3626 Dunckel Road
    Lansing, Michigan 48909
    (517) 332-3555

## CERTIFICATE OF SERVICE

I certify that on January 18, 2006, I electronically filed the above document via the Clerk

of the Court's Generic Email Box, which will send notice of electronic filing to the following:

Rebecca A. Womeldorf
Spriggs & Hollingsworth
1350 I Street, N.W., Suite 900
Washington, DC  20005
Tel:  202-898-5800
Fax:  202-682-1639
*Attorney for Plaintiff*

William C. Fulkerson
Robert J. Jonker
Daniel P. Ettinger
Joseph A. Kuiper
Warner Norcross & Judd, LLP
900 Fifth Third Center
111 Lyon Street, N.W.
Grand Rapids, MI  49503
Tel:  616-752-2161
Fax:  616-222-2161
*Attorneys for Plaintiff*

Patricia Miller
Gina Allery
U.S. Department of Justice
601 "D" St., N.W.
Washington, DC  20026
Tel:  202-305-1117
Fax:  202-305-0271
*Attorney for Defendants*

Conly J. Schulte
Shilee T. Mullin
Monteau & Peebles, LLP
12100 W. Center Road, #202
Omaha, NE  68144
Tel:  402-333-4053
Fax:  402-333-4761
*Attorneys for Intervenor*
*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*

10

Nicholas Yost
Sonnenschein Nath & Rosenthal, LLP
685 Market Street, 6th Floor
San Francisco, CA  94105
Tel:  415-882-5000
Fax:  415-543-5472
*Attorney for Intervenor*
*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*

Edward Dumont
Seth Waxman
Wilmer Cutler Pickering Hale & Dorr
2445 M Street, Nw
Washington DC 20037
Tel:  202-663-6910
Fax:  202-663-6363
*Attorneys for Intervenor*
*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians*

s/John A. Watts

11

Wednesday October 19, 2005          Regular Meeting    Wayland Township Hall

The regular meeting of the Wayland Township Board was called to order by Supervisor Marklevitz at 7:30pm.  A roll call showed members present:  Taylor, Marklevits, Patchak and Staley.  Member Burr had an excused absence.  A motion was made by Staley and supported by Patchak to accept the minutes of the October 03rd meeting as typed and delivered.  All yes.  Motion carried.  The agenda was amended to delete item D.  A motion was made by Taylor and supported by Staley to adopt the amended agenda for the 19th of October.  All yes.  Motion carried.

Commissioner Black shared county news.

OLD BUSINESS
None

NEW BUSINESS
A motion was made by Patchak and supported by Staley to adopt resolution 15-2005.  This resolution extends the SUP of Aggregate Industries for another year.  Mr. Mason and Mr. Schills were in attendance and answered questions posed by the Board.  The renewal of this SUP must be addressed each year.  There were 3 yes votes, 1 no vote and one members absent.  Motion carried.

A motion was made by Staley and supported by Patchak to adopt resolution 16-2005.  This resolution adopts the "lock box ordinance" for the township.  All yes votes. 1 member was absent.  Motion carried.

A motion was made by Taylor and supported by Patchak to adopt resolution 17-2005.  This resolution balances the budget for the second quarter of the fiscal year.  All yes votes. 1 member was absent.  Motion carried.

Planning commission report—no report.

The rough draft of the FOC briefing concerning the proposed casino was discussed and approved with corrections.  This will be returned to the attorney.

Cemetery report—The workers are still doing foundation and are doing general clean-up.  The water will be turned off November 1st.

The communications were read.

There were comments regarding the closing of the bridge on 10th street.

The proposed agenda for the November 02nd meeting with the city was handed out and has been sent to the city



EXHIBIT

O

A motion was made by Taylor and supported by Staley to adjourn.  All yes.  Meeting adjourned at 8:07pm

Beverly Taylor, Clerk

Monday November 05, 2007          Regular Meeting       Wayland Twp Hall

The meeting was called to order at 7:30pm by Supervisor VanVolkinburg. The Pledge of Allegiance was led by Trustee Patchak. A roll call showed members present: Kamyszek, Staley, Patchak, VanVolkinburg and Taylor. A motion was made by Staley and supported by Patchak to accept the minutes of the October 17th regular meeting and the October 24th work session as typed and delivered. All yes. Motion carried. The agenda was amended to delete item "Mary Jones" and to add item "pay bills". A motion was made by Taylor and supported by Kamyszek to adopt the amended agenda for the November 05th meeting. All yes. Motion carried.

A citizen inquired about the status of the re-surfacing of 6th Street. He was informed that it wouldn't happen until next year.

OLD BUSINESS
A motion was made by VanVolkinburg and supported by Staley to hire the law firm of Foster, Swift, Collins and Smith as the township attorney. A roll call vote showed all yes votes. Motion carried.

Library report—There is a lot activity involving children. The library board approved the property next to the library.

Planning Commission report—the special use requested by CBS Outdoor was denied. The temporary housing and off street parking ordinances were discussed.

Commissioner Black shared county news.

An update was given on the Gun Lake Tribe and the Casino. The tribe is hosting films on Tuesdays during the month of November.

NEW BUSINESS

The Resolution numbered 15-1997 that names the people that can contact the township's attorney was discussed and decided that it still satisfied the problem and will be left in effect.

A motion was made by Kamyszek and supported by Staley to pay the bills. A roll call vote showed all yes. Motion carried.

The clerk will purchase a new vacuum for use at the hall.

A motion was made by Taylor and supported by Staley to adjourn. All yes. Motion carried. Meeting adjourned at 7:56pm.

Beverly Taylor, Clerk

ALL-STATE LEGAL®     EXHIBIT

P

June 02, 2008                    Regular Meeting                    Wayland Twp Hall

The meeting was called to order at 7:30pm by Supervisor VanVolkinburg. The Pledge of Allegiance was led by Treasurer Kamyszek. A roll call showed all members present. A motion was made by Staley and supported by Kamyszek to accept the minutes of the regular meeting held on May 05 and the special meeting held on May 21 as typed and delivered. All yes. Motion carried. A motion was made by Staley and supported by Patchak to adopt the agenda for the June 02 meeting as typed and delivered. All yes. Motion carried.

Shelly Edgerton was in attendance and spoke regarding her candidacy for the State Representative for the 88th district.

Don Black, County Commissioner, shared county news.

Library report –The library is holding summer reading programs aimed at younger readers, teen readers and an adult program. The library is hoping to hear about the land to the south of the building sometime this month.

Recycling update—Curbside recycling is available. The price for pickup two times a month range from $1.80 to $1.91. The price for once a month pickup is $1.50 to $1.60. These prices are for a three year period, increasing in increments. A fuel surcharge is also a possibility. The township collected $26,000.00 from the winter tax surcharge. This would allow curbside for roughly 1,043 households. It is also possible that the dumpster at Weick's Foodtown could be pulled and that would bring the township back into budget. The supervisor will meet with the other supervisors that are involved with the paying for this dumpster and discuss the removal of this dumpster. No decision was made at this meeting. The township is still looking at different solutions.

Planning Commission report—The commission held two meeting that were work sessions on the Master Plan. A joint meeting with the Board will be held on July 9th at 6:30pm. The new SUP request from Aggregate Industries was gone over. The new SUP is for a pit near 136th and Patterson. The pit off 129th would be closed and reclaimed to the township's specifics.

Gun Lake Casino update—The tribe has won all the law suits to this point. There is another one set for June 11th. The Senate wants to vote on this matter before the summer break.

OLD BUSINESS
None

NEW BUSINESS
The recreation vehicle and temporary dwelling update has been returned for the county planning commission. This ordinance was written to allow for more control of the length of time these dwelling could be used for living quarters. A motion was made by

Kamyszek and supported by Staley to table any Board decision until the Board can see the final copy. All yes. Motion carried.

A motion was made by Kamyszek and supported by Patchak to pay the bills A roll call vote showed all yes votes. Motion carried.

A public hearing on the proposed Sandy Beach Drain will be held at 10:00am on June 13th at the Yankee Springs Township Hall.

There was a comment from the floor regarding the recycling—to involve the public and the possibility of a milage vote.

A motion was made by Taylor and supported by Staley to adjourn. All yes. Meeting adjourned at 8:45pm.

Beverly Taylor, Clerk



**U.S. Department of Justice**

Environment and Natural Resources Division

GA

---

| | |
|---|---|
| *Indian Resources Section* | *Telephone (202) 305-0269* |
| *P.O. Box 44378* | *Facsimile (202) 305-0271* |
| *L'Enfant Plaza Station* | |
| *Washington, DC  20026-4378* | |

---

July 31, 2008

Bruce Courtade
Rhodes McKee PC
161 Ottawa NW
Suite 600
Grand Rapids, MI  49503
(616) 233-5152

      Re:    <u>Patchak v. Kempthorne, et al.</u>

Mr. Courtade:

      Pursuant to our telephone conversation today, I am writing this letter to inform you of how the United States intends to proceed in the above-captioned case. It is my understanding that you intend to file a Verified Complaint tomorrow, August 1, 2008, in Federal District Court in the District of Columbia, challenging the Department of the Interior's acquisition of land into trust for the Gun Lake Band of Indians. The Complaint will have only one cause of action, that the Indian Reorganization Act limits the United States' authority to acquire land into trust for Indian tribes to those tribes that were recognized in 1934, when the IRA was enacted. The United States' acquisition of the Gun Lake Band's land into trust was the subject of previous litigation, <u>MichGO v. Kempthorne</u>. During the pendency of that litigation, the United States agreed not to take the land into trust until the D.C. Circuit Court of Appeals issues its mandate. To date, that has not occurred. Wherefore, the United States agrees not to take the land into trust for purposes of the above-captioned case until the mandate issues in <u>MichGO v. Kempthorne</u> and will provide Plaintiff with 15 calendar days following the issuance of the mandate in which to file their motion for preliminary injunction to prevent the United States from taking the land into trust. The United States will also notify Plaintiff when the mandate issues in <u>MichGO v. Kempthorne</u>.

                                Sincerely,

                                  Gina L. Allery



EXHIBIT

Q

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————— )
                                                          )
DAVID PATCHAK,                          )
                                                          )
            Plaintiff,                            )
                                                          )
    vs.                                              )
                                                          )
DIRK KEMPTHORNE, in his official capacity    )    Case No. 1:08-CV-01331
as SECRETARY OF THE UNITED STATES          )    Hon. Richard J. Leon
DEPARTMENT OF THE INTERIOR,             )
                                                          )
and                                               )
                                                          )
CARL J. ARTMAN, in his official capacity as    )
ASSISTANT SECRETARY OF THE UNITED      )
STATES DEPARTMENT OF THE INTERIOR,   )
BUREAU OF INDIAN AFFAIRS,               )
                                                          )
            Defendants.                          )
———————————————————————— )
                                                          )
MATCH-E-BE-NASH-SHE-WISH BAND OF      )
POTTAWATOMI INDIANS, a federally        )
recognized Indian Tribe,                      )
                                                          )
            Intervenor.                          )
———————————————————————— )

**PROPOSED ANSWER OF THE**
**MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS**

Proposed Intervenor Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians ("Tribe"), a federally-recognized Indian Tribe, submits this Answer to Plaintiff David Patchak's Complaint. The Tribe specifically denies each and every allegation of the Complaint not otherwise expressly admitted, qualified or denied in this Answer.

## JURISDICTION AND VENUE

1.      The Tribe admits that this action purports to be an action for review pursuant to the Administrative Procedure Act ("APA") and the Indian Reorganization Act of 1934 ("IRA"), but denies that Plaintiff is entitled to the relief requested. The Tribe denies the balance of the allegations contained in paragraph 1.

2.      The Tribe admits the allegation contained in paragraph 2.

## PARTIES AND STANDING

3.      The allegation in paragraph 3 constitutes Plaintiff's description and characterization of himself, to which no substantive response is required.

4.      The Tribe admits that Dirk Kempthorne is the Secretary of the United States Department of the Interior, which is an administrative agency of the United States.

5.      The Tribe denies that Carl J. Artman is the Assistant Secretary of the United States Department of the Interior, Bureau of Indian Affairs, which is an administrative agency of the United States, as Mr. Artman purportedly resigned from that position in May 2008.

6.      The Tribe denies the allegations in paragraph 6.

7.      The Tribe denies the allegations in paragraph 7.

## STATEMENT OF FACTS

8.      The Tribe admits that the United States Department of the Interior ("DOI") and the Bureau of Indian Affairs ("BIA") (collectively termed "Defendants") have approved taking a

147-acre parcel of land into trust for the benefit of the Tribe and that the Tribe intends to construct and operate a casino on the parcel. The allegation that the above actions are unlawful is a conclusion of law and therefore requires no response, but to the extent a response is required, the Tribe denies that the above actions are in any way unlawful.

9.     The Tribe lacks information or knowledge sufficient to form a belief as to the truth of Plaintiff's assertions regarding his intent in moving into the area or his subjective fears. The Tribe denies the allegations that the Tribe's casino will cause any negative impacts and that Plaintiff will be disproportionately affected by the Tribe's casino. The Tribe further denies the remaining allegations contained in paragraph 9.

10.     Paragraph 10 is a conclusion of law and therefore requires no response. However, to the extent that a response is required, the Tribe denies paragraph 10.

11.     The Tribe admits that Judge Penn issued a stay in the litigation captioned *MichGO v. Kempthorne*, and states that Judge Penn's orders speak for themselves.

   a.     The Tribe admits that on April 29, 2008, the United States Court of Appeals for the District of Columbia Circuit issued an opinion affirming the District Court, and states that the substance of the April 29, 2008 opinion speaks for itself.

   b.     The Tribe admits that MichGO filed a petition for rehearing en banc on May 13, 2008 and that the Court denied the petition on July 25, 2008, and states that the July 25, 2008 order speaks for itself.

   c.     The Tribe was not a party to conversations between MichGO and Defendants and lacks first hand knowledge of such conversation.

d.     The Tribe denies that the United States District Court from the District of Columbia issued a mandate on Friday, August 1, 2008.  The Tribe further states that the Court of Appeals for the District of Columbia Circuit has not issued its mandate.

12.     Paragraph 12 contains conclusions of law, to which no response is required.

a.     Paragraph 12(a) contains conclusions of law to which no response is required.

b.     Paragraph 12(b) contains conclusions of law to which no response is required.

13.     Paragraph 13 calls for relief.  The Tribe denies that Plaintiff is entitled to any of the relief requested.

14.     Paragraph 14 calls for relief.  The Tribe denies that Plaintiff is entitled to any of the relief requested, and further denies that Plaintiff will suffer any irreparable harm.

15.     The Tribe admits the allegations contained in paragraph 15.

16.     The allegation contained in paragraph 16 contains conclusions of law, to which no response is required.  To the extent that a response is required, the Tribe denies that 62 Fed. Reg. 38,113 (July 16, 1997) states that "[i]n 1870, the Gun Lake Band discontinued its compliance with its 1855 treaty by moving from Oceana County to Allegan County."  With respect to the second sentence, the Tribe admits that 62 Fed. Reg. 38,113 (July 16, 1997) states that the Tribe "received annuity payments under this [the 1855 Treaty of Detroit] until the final commutation payment in 1870."

17.     Paragraph 17 contains an issue of law, to which no response is required

18.     The Tribe admits that it petitioned the Department of Interior to be acknowledged as an Indian Tribe in approximately 1994, pursuant to 25 C.F.R. Part 83, and that the DOI determined that the Gun Lake Tribe exists as an Indian tribe on or about October 23, 1998.

19.     Insofar as the Plaintiff categorizes the Bradley Tract as "rural," the Tribe denies the allegation contained in paragraph 19, but the Tribe admits the remaining allegations contained in paragraph 19.

20.     The Tribe admits that the Tribe submitted a fee-to-trust application to the United States for a parcel of land termed as "the Bradley Tract," requesting the United States to accept the Tract into trust, and that a portion of the Bradley Tract will be used to construct and operate a casino.  The Tribe denies the allegations of paragraph 20, insofar as they suggest the casino will occupy the entire Bradley Tract.

21.     The Tribe admits the allegations contained in paragraph 21.

22.     Paragraph 22 contains conclusions of law, to which no response is required.  To the extent that a response is required, the Tribe states that the IRA and *United States v. John*, 437 U.S. 634, 650 (1978) speak for themselves, and the Tribe denies that the IRA only applies to Indian tribes that were federally recognized in 1934.

23.     Paragraph 23 contains a conclusion of law, to which no response is required.  To the extent that a response is required, the Tribe states that the Department of Interior ("DOI") has determined that the Tribe continually existed as an Indian tribe since at least 1870, *see* 63 Fed. Reg. 56,936 (Oct. 23, 1998).

24.     The Tribe admits that it filed a brief in the *MichGO v. Kempthorne* litigation, but states that the brief speaks for itself.

**CAUSE OF ACTION**

25.    The Tribe avers that paragraph 25 reasserts and incorporates the allegations contained in the previous allegations and therefore no further response is required.

26.    Paragraph 26 contains a conclusion of law, to which no response is required.  To the extent that a response is required, the Tribe denies that IRA limits Defendants' power to take land into trust only for Indian tribes that were federally-recognized in June 1934.

27.    Paragraph 27 contains a conclusion of law to which no response is required.  To the extent that a response is required, the Tribe states that the Department of Interior has determined that the Tribe continually existed as an Indian tribe since at least 1870, *see* 63 Fed. Reg. 56,936 (Oct. 23, 1998).

28.    Paragraph 28 contains a conclusion of law to which no response is required.  To the extent that a response is required, the Tribe denies the allegations in paragraph 28.

29.    The Tribe admits that the First Circuit in *Carcieri v. Kempthorne* held that the IRA does not prevent fee-to-trust transfers for Indian tribes not recognized in 1934, and admits that the United States Supreme Court has granted a petition for a writ of certiorari on that issue.

30.    Paragraph 30 contains a conclusion of law, to which no response is required.  To the extent that a response is required the Tribe denies paragraph 30 and states that the Department of Interior has determined that the Tribe continually existed as an Indian tribe since at least 1870, *see* 63 Fed. Reg. 56,936 (Oct. 23, 1998).

31.    Paragraph 31 contains a call for relief, to which no response is required.  To the extent that a response is required, the Tribe denies that Plaintiff is entitled to judicial review under the APA.

32.    Paragraph 32 is a call for relief to which no response is required.  To the extent that a response is required, the Tribe denies that Plaintiff is entitled to any of the relief requested. The Tribe further denies that the Plaintiff will sustain any injury.

33.    Paragraph 33 is a call for relief to which no response is required.  To the extent that a response is required, the Tribe denies that Plaintiff is entitled to any of the relief requested.

### PRAYER

The remaining paragraphs are calls for relief.  The Tribe denies that Plaintiff is entitled to any of the relief, attorney's fees or costs requested.

### INTERVENOR'S AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint should be dismissed because the Plaintiff has failed to state a claim upon which relief may be granted.

### Second Affirmative Defense

The Complaint should be dismissed because the Plaintiff lacks standing to bring this action.

### Third Affirmative Defense

The Complaint should be dismissed because the Plaintiff is precluded from bringing this suit by the doctrine of laches.

### Fourth Affirmative Defense

The Complaint should be dismissed because the Plaintiff is precluded from bringing this suit by res judicata.

**<u>Fifth Affirmative Defense</u>**

The Complaint should be dismissed because Plaintiff failed to file his complaint within the period prescribed by the statute of limitations.

**<u>Sixth Affirmative Defense</u>**

The Tribe asserts all other affirmative defenses that may be revealed subsequent to this filing.

WHEREFORE, the Tribe respectfully requests judgment dismissing the Plaintiff's Complaint herein, together with all costs and reimbursement for defense of this action and for such other relief as the Court deems just and proper.


Respectfully submitted August 19, 2008.


<div style="margin-left:40%">

Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians, Intervenor-Defendant,

By    /s/ Conly J. Schulte

Conly J. Schulte
Shilee T. Mullin
FREDERICKS PEEBLES & MORGAN LLP
3610 North 163rd Plaza
Omaha, NE  68116
Telephone (402) 333-4053
Fax (402) 333-4761

Seth P. Waxman
Edward C. DuMont
Demian S. Ahn
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC  20006
Telephone (202) 663-6910
Fax (202) 663-6363

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2008, a copy of the foregoing PROPOSED ANSWER OF THE MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS was served by first class mail on the parties below, and was filed electronically with the Clerk of the Court. The electronic filing prompted automatic service of the filing to all counsel of record in this case who have obtained CM/ECF passwords. The following parties were additionally served by first class mail:

Tobey B. Marzouk
MARZOUK & PARRY
1120 Nineteenth Street, N.W., Suite 750
Washington, DC  20036
Counsel for Plaintiff

Bruce A. Courtade
Gregory G. Timmer
RHOADES MCKEE
161 Ottawa Ave. N.W., Ste. 600
Grand Rapids, MI  49503
Counsel for Plaintiff

Gina L. Allery
U.S. Department of Justice
Environment & Natural Resources Div.
Indian Resources Section
P.O. Box 44378
Washington, D.C. 20026-4378

_____/s/ Conly J. Schulte_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____ )
                                )
DAVID PATCHAK,                  )
                                )
              Plaintiff,        )
                                )
    vs.                         )      Case No. 1:08-CV-01331-RJL
                                )      Hon. Richard J. Leon
DIRK KEMPTHORNE, in his         )
official capacity as SECRETARY  )
OF THE UNITED STATES            )
DEPARTMENT OF THE               )
OF THE INTERIOR,                )
                                )
and                             )      **[PROPOSED] ORDER**
                                )
CARL J. ARTMAN, in his official )
capacity as ASSISTANT           )
SECRETARY OF THE UNITED         )
STATES DEPARTMENT OF THE        )
INTERIOR, BUREAU OF             )
INDIAN AFFAIRS,                 )
                                )
              Defendants.       )
_____ )
                                )
MATCH-E-BE-NASH-SHE-WISH        )
BAND OF POTTAWATOMI             )
INDIANS, a federally recognized )
Indian Tribe, c/o Hon. D.K. Sprague, )
Chairman, Tribal Headquarters, P.O. )
Box 218, Dorr, MI 49323,        )
                                )
              Intervenor.       )
_____ )

Presently before the Court is the Intervenor Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians' Unopposed Motion to Intervene in the above-captioned action. After thoroughly reviewing the submissions on this Motion, the Court finds that the Motion to Intervene is hereby GRANTED.

**IT IS SO ORDERED.**

_____        _____
Dated                                    The Honorable Richard J. Leon
                                         United States District Court Judge