## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DAVID PATCHAK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 08-1331 (RJL)** |
| | ) | |
| **SALLY JEWELL, in her official** | ) | |
| **capacity as Secretary of the United** | ) | **FILED** |
| **States Department of the Interior,**[1] | ) | |
| *et al.,* | ) | **JUN 1 7 2015** |
| | ) | |
| **Defendants,** | ) | Clerk, U.S. District & Bankruptcy |
| | ) | Courts for the District of Columbia |
| **and** | ) | |
| | ) | |
| **MATCH-E-BE-NASH-SHE-WISH** | ) | |
| **BAND OF POTTAWATOMI** | ) | |
| **INDIANS,** | ) | |
| | ) | |
| **Intervenor-Defendant.** | ) | |

## MEMORANDUM OPINION

(June __16__, 2015) [Dkts. ##76, 78, 80, 89]

This case is before the Court on remand from the United States Court of Appeals

for the District of Columbia and the Supreme Court of the United States. Plaintiff David

Patchak ("plaintiff") is challenging the Secretary of the Interior's ("Secretary") decision

to take into trust two parcels of land in Allegan County, Michigan, on behalf of the

Intervenor-Defendant Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians (the

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the court will automatically substitute that officer's successor. Accordingly, the Court substitutes Sally Jewell, the current Secretary of the Interior for the former Secretary, Ken Salazar.

"Tribe") pursuant to the Indian Reorganization Act ("IRA"), 25 U.S.C. § 465.  In a

Verified Complaint filed on August 1, 2008, plaintiff sought an injunction barring the

Secretary from taking the land into trust, claiming that the Secretary lacked authority to

do so under the IRA.  Compl. ¶ 28 [Dkt. #1].  This Court dismissed the case for lack of

standing on August 20, 2009.  Mem. Op. [Dkt. #56].  Following remand by the Supreme

Court, both parties filed motions for summary judgment.  Presently before the Court are

Plaintiff's Motion to Strike the Administrative Record Supplement [Dkt. #76],

Intervenor-Defendant's Motion for Summary Judgment [Dkt. #78], Plaintiff's Motion for

Summary Judgment [Dkt. #80], and Plaintiff's Unopposed Motion to File Consolidated

Reply Brief and to Exceed Page Limits Specified by Local Rule [Dkt. #89].  Upon

consideration of the parties' pleadings, the relevant case law, and the entire record herein,

this Court DENIES Plaintiff's Motion to Strike the Administrative Record Supplement,

GRANTS Plaintiff's Unopposed Motion to File Consolidated Reply Brief and to Exceed

Page Limits Specified by Local Rule, DENIES Plaintiff's Motion for Summary

Judgment, and GRANTS Intervenor-Defendant's Motion for Summary Judgment.

## BACKGROUND

This Opinion represents the latest chapter in plaintiff's quest to enjoin a gaming

casino in Allegan County, Michigan.  This case's history is, to say the least, lengthy, and

the Court, for the sake of economy, recounts only those portions necessary to its holding.

### I.    Statutory Framework

Since the 1800s, Congress has enacted various statutes to regulate Indian affairs.

One such initiative, the Indian Reorganization Act of 1934, was "designed to improve the

economic status of Indians by ending the alienation of tribal land and facilitating tribes'

acquisition of additional acreage." *See* 1-1 Cohen's Handbook of Federal Indian Law §

1.05.  Its animating purpose was therefore to "establish machinery whereby Indian tribes

would be able to assume a greater degree of self-government, both politically and

economically." *Morton v. Mancari*, 417 U.S. 535, 542 (1973).  To that end, the IRA

authorizes the Secretary "to acquire . . . any interest in lands" on behalf of groups that

meet the statutory definition of "Indians." *See* 25 U.S.C. § 465.  The IRA defines

"Indians" as "all persons of Indian descent who are members of any recognized Indian

tribe now under Federal jurisdiction."[2]  25 U.S.C. § 479.  Land acquired pursuant to the

IRA "shall be taken in the name of the United States in trust for the Indian tribe or

individual Indian for which the land is acquired," 25 U.S.C. § 465, and may be

designated as part of the Tribe's official reservation, *id.* at § 467.

Like the IRA, the Indian Gaming Regulatory Act of 1998 (the "IGRA") was

enacted to promote "tribal economic development, self-sufficiency, and strong tribal

governments." 25 U.S.C. § 2702(1).  To facilitate this goal, the IGRA provides "a

statutory basis for the operation of gaming by Indian tribes," *id.*, and allows gaming on

land that was taken into trust as part of the "initial reservation of an Indian tribe

acknowledged by the Secretary under the Federal acknowledgment process," 25 U.S.C. §

2719(b)(1)(B).  A tribe may be formally acknowledged if it can "establish a substantially

---

[2] While the IRA does not elaborate on what it means to be a "recognized Indian Tribe now under
Federal jurisdiction," the Supreme Court recently interpreted the word "now" to refer to the date
of the IRA's enactment in June 1934. *Carcieri v. Salazar*, 555 U.S. 379, 382 (2009).  The
Supreme Court left open the question of what constitutes "Federal jurisdiction."

continuous tribal existence" and has "functioned as [an] autonomous entit[y] throughout history until the present." *See* 25 C.F.R. § 83.3(a).

## II.    Factual Background

The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians is now a federally-recognized Indian tribe.  Compl. ¶ 18.  But this was not always the case.  The Tribe, though in existence for over two centuries, has endured a lengthy struggle for federal recognition.  It was initially recognized by the federal government between 1795 and 1855, during which time it was party to no fewer than sixteen treaties with the United States.  Compl. ¶ 15; AR001987.[3]  This recognition was, however, short-lived. Beginning in 1855, the Tribe fell victim to a slew of federal policies that divested the Tribe of both its ancestral lands and its sovereign status.  *See* Compl. ¶¶ 16-17.

The Tribe remained dispossessed for much of the 20th century.  *See* Compl. ¶¶ 16-18.  In 1998, after decades of landlessness, the Tribe sought to reinstate its sovereign status under the modern federal acknowledgment procedures.  Compl. ¶ 18.  It succeeded. On October 23, 1998, the Secretary of the Interior proclaimed the Tribe an "Indian tribe within the meaning of Federal law," thus entitling the Tribe, and its members, to a bevy of federal protections.  *See* 63 Fed. Reg. 56936-01 (1998).

In 2001, shortly after receiving federal acknowledgment, the Tribe identified a 147-acre tract of land in the Township of Wayland, Michigan, ("the Bradley Tract") that it wished to acquire as its "initial reservation" under the IRA.  *See* AR001438.  In its

---

[3] References to "AR" correspond to the Administrative Record filed on October 6, 2008.  *See* [Dkt. #21].

4

ensuing trust application, the Tribe requested permission to construct and operate a 193,500 square foot gaming and entertainment facility on the Bradley Tract. AR001445. The Tribe prevailed, and on May 13, 2005, the Department of the Interior issued a Notice of Final Agency Determination accepting the Bradley Tract into trust to "be used for the purpose of construction and operation of a gaming facility." 70 Fed. Reg. 25596-02 (May 13, 2005). In January 2009, the Secretary formally acquired the Bradley Tract on the Tribe's behalf. Decl. Chairman David K. Sprague Supp. Intervenor-Def.'s Mot. Summ. J. ("Sprague Decl.") ¶ 14 [Dkt. #78-1]. Thereafter, the Tribe incurred approximately $195,000,000 in debt to develop the land. Sprague Decl. ¶ 18. Its efforts culminated in the opening of the Gun Lake Casino on February 10, 2011. Sprague Decl. ¶ 19.

### III.   Procedural Background

Plaintiff filed the present lawsuit on August 1, 2008 under section 702 of the Administrative Procedure Act ("APA"), arguing that because the Tribe was not formally recognized when the IRA was enacted in June 1934, the Secretary lacked authority to take the Bradley Tract into trust. Compl. ¶¶ 25-28. On August 19, 2009, I dismissed this action for lack of subject matter jurisdiction. Mem. Op. [Dkt. #56]. Plaintiff appealed to our Circuit Court, which reversed and held that plaintiff indeed had standing to pursue his action. *See Patchak v. Salazar*, 632 F.3d 702 (D.C. Cir. 2011). On June 18, 2010, the United States Supreme Court affirmed the Circuit Court's decision and remanded the case to this Court for adjudication on the merits of plaintiff's suit. *See*

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199 (2012).

Since this case was remanded, two events have altered the legal landscape. First, on September 3, 2014, the Secretary issued an Amended Notice of Decision concerning the Tribe's fee-to-trust application for two other parcels of land it sought to acquire. SAR000617-58.[4] In so doing, the Secretary expressly considered, and confirmed, its authority under the IRA to take land into trust on behalf of the Tribe. *See* SAR000650 ("The [Tribe] unquestionably was under federal jurisdiction prior to 1934. . . . [And] the [Tribe's] under federal jurisdiction status remained intact in and after 1934."). Second, on September 26, 2014, President Obama signed into law the Gun Lake Trust Land Reaffirmation Act (the "Gun Lake Act" or "the Act"). Pub. L. No. 113-179, 128 Stat. 1913, Sec. 2(a)-(b). The Act, which bears directly on the instant case, declares as follows:

> (a) IN GENERAL.—The land taken into trust by the United States for the benefit of the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians and described in the final Notice of Determination of the Department of the Interior (70 Fed. Reg. 25596 (May 13, 2005)) is reaffirmed as trust land, and the actions of the Secretary of the Interior in taking that land into trust are ratified and confirmed.
>
> (b) NO CLAIMS.—Notwithstanding any other provision of law, an action (including an action pending in a Federal court as of the date of enactment of this Act) relating to the land described in subsection (a) shall not be filed or maintained in a Federal court and shall be promptly dismissed.

Pub. L. No. 113-179, 128 Stat. 1913, Sec. 2(a)-(b).

---

[4] References to "SAR" are to the Administrative Record Supplement. *See* [Dkt. #75].

Thereafter, on October 31, 2014, the parties filed motions for summary judgment. For the following reasons, the Court GRANTS Intervenor-Defendant's Motion for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment.

## DISCUSSION

Plaintiff would have this Court disregard the Gun Lake Act and proceed directly to the merits of his challenge. I decline to do so. Because the Gun Lake Act purports to moot plaintiff's case, it is hard to see how it can be ignored. To disregard it entirely would, moreover, violate the usual principle that a court is to apply the law in effect at the time it rules. *See Landgraf v. USI Film Prod.*, 511 U.S. 244, 264 (1994).

As a fallback position, plaintiff argues that the Act is void because it violates numerous constitutional provisions, including separation of powers principles, the First Amendment Right to Petition, Fifth Amendment Due Process, and the ban on Bills of Attainder. *See* Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") at 25-39 [Dkt. #80-1]. For the reasons discussed herein, I reject each of these arguments and find that the Gun Lake Act is constitutional and, further, that it moots plaintiff's case.

## I.    APA REVIEW

Federal courts are courts of limited jurisdiction and may not reach the merits of a case absent jurisdiction to do so. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998). Plaintiff brings his suit pursuant to the Administrative Procedure Act, which entitles any person "adversely affected or aggrieved by [an] agency action" to judicial review. *See* 5 U.S.C. § 702. As the APA makes clear, there is a "strong presumption" of reviewability of agency decisions. *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S.

667, 670 (1986). This presumption, "like all presumptions," may "be overcome by . . . specific language or specific legislative history that is a reliable indicator of congressional intent." *Id.* at 673 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)); *see* 5 U.S.C. § 701(a) (limiting judicial review to the extent that a federal statute "preclude[s] judicial review" or the "agency action is committed to agency discretion by law"). Once that presumption is overcome, courts may venture no further into the merits of the case. "For a court to pronounce upon the meaning" of federal action when "it has no jurisdiction to do is, by very definition, for a court to act ultra vires." *See Steel Co.*, 523 U.S. at 101-02. Such is the case here.

Section 2(b) of the Gun Lake Act states that "no claims" regarding the Secretary's decision to take the Bradley Tract into trust shall be "maintained in a Federal court." *See* Pub. L. No. 113-179, 128 Stat. 1913, Sec. 2(b). Section 2(b) tracks, moreover, section 2(a)'s ratification of the Secretary's decision, leaving no doubt that Congress intended to have the final word. *See id.* This intent is born out in the legislative history. The House Committee on Natural Resources stated, for example, that the Act, if passed, "would void a pending lawsuit [by neighboring landowner David Patchak] challenging the lawfulness of the Secretary's original action to acquire the Bradley Property." H.R. Rep. 113-590 (2014). The Senate Committee on Indian Affairs agreed that the Act "would prohibit any lawsuits" related to the "lands taken into trust by the Department of the Interior (DOI) for the benefit of the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians in the state of Michigan." S. Rep. 113-194 at 3 (2014). Taken together, the Act's plain language and legislative history manifest a clear intent to moot this litigation. Barring some

8

constitutional infirmity, this Court therefore lacks jurisdiction to reach the merits of plaintiff's claim.

## II.   Constitutionality Of The Gun Lake Act

While Congress may have removed this Court's jurisdiction over plaintiff's APA claim, it did not foreclose consideration of the Gun Lake Act's constitutionality. Indeed, section 2(b) only withdraws judicial review of "action[s] relating to" the Secretary's acquisition of the Bradley Tract. *See* Pub. L. No. 113-179, 128 Stat. 1913, Sec. 2(b). Nothing in the Act bars consideration of constitutional challenges to *Congress*'s action, and the Court declines to construe it in such a fashion.[5]   Absent such an impediment, the Court may address plaintiff's constitutional challenges.

The Court's limited jurisdiction does not, however, guarantee plaintiff a victory. Quite the opposite is true. Federal statutes are presumptively constitutional, *Bowen v. Kendrick*, 487 U.S. 589, 617 (1988), and litigants challenging a statute's constitutionality bear an "extremely heavy burden," *United States v. Turner*, 337 F. Supp. 1045, 1048 (D.D.C. 1972). Only "the most compelling constitutional reasons" may justify invalidating "a statutory provision that has been approved by both Houses of Congress and signed by the President." *Mistretta v. United States*, 488 U.S. 361, 384 (1989)

---

[5] To construct the statute otherwise would raise serious concerns about its constitutionality, and, in such a case, I heed the "cardinal principle" of statutory interpretation and choose "a construction of the statute . . . by which the (constitutional) question(s) may be avoided." *See Johnson v. Robison*, 415 U.S. 361, 367 (1974) (alternation in original) (internal quotation marks omitted); *Nat'l Coalition to Save Our Mall v. Norton*, 269 F.3d 1092, 1095 (D.C. Cir. 2001) (finding that although a statute removed Article III jurisdiction to review an agency action, it did "not touch [the court's] jurisdiction over [the statute's] own constitutionality").

(citation and internal quotation marks omitted).   Unfortunately for plaintiff, I find that he has not surmounted this burden and, accordingly, uphold the Act.

## A. Separation of Powers

Plaintiff argues that the Act raises two separation of powers concerns.  Plaintiff first contends that section 2(b) infringes the role of the judiciary by requiring dismissal of this action. *See* Pl.'s Mem. at 26-32.  Plaintiff next argues that by reaffirming the Secretary's May 2005 decision to take the Bradley Tract into Trust, section 2(a) unlawfully imposes Congress's "own interpretation of the IRA" on the federal courts. *See* Pl.'s Consol. Reply Defs.' & Intervenor-Def.'s Opp'n to Pl.'s Mot. Summ. J. ("Pl.'s Reply") at 31 [Dkt. #90].  For the reasons discussed below, I find both arguments unavailing.

Plaintiff's first contention presents a thorny legal issue.  The Constitution prohibits the legislature from coopting the judiciary's function.  The seminal case on this issue is *United States v. Klein*, 80 U.S. (13 Wall.) 128 (1871).  There, the executor of a Confederate estate sought to recover property seized by the Union army during the Civil War.  In his suit, the executor relied on a statute permitting recovery for landowners that were loyal to the Union, proof of which was satisfied by receipt of a Presidential pardon. *Id.* at 131-32.  After the plaintiff recovered in the Court of Claims, Congress passed a statute directing courts to construe proof of a Presidential pardon as proof of disloyalty and, further, to dismiss, for lack of jurisdiction, any cases in which proof of a Presidential pardon was submitted. *Id.* at 133-34.  Faced, on appeal, with a statute that dictated how it was to adjudicate claims of Union loyalty, the Supreme Court declared the statute

unconstitutional and refused to give effect to an Act of Congress that "prescribe[d] rules of decision to the Judicial Department of the government in cases pending before it." *See id.* at 146.

Although *Klein* establishes limits on legislative power, it simply "cannot be read as a prohibition against Congress's changing the rule of decision in a pending case, or (more narrowly) changing the rule to assure a pro-government outcome." *Nat'l Coalition to Save Our Mall v. Norton*, 269 F.3d 1092, 1096 (D.C. Cir. 2001). To preserve the balance of federal power, *Klein*'s progeny have clarified that the Constitution is not offended when Congress amends substantive federal law, even if doing so affects pending litigation. *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) (Congress may "amend[] applicable law" in a way that impacts the outcome of a pending case without violating *Klein* (internal quotation marks omitted)); *see also Miller v. French*, 530 U.S. 327, 348-50 (2000) (finding no separation of powers issue where a statute "simply impose[d] the consequences of the court's application of the new legal standard"); *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 441 (1992) (finding no separation of powers violation where a statute "amend[ed] [the] applicable law"). Although the line between a permissible "amendment" of the underlying law and an impermissible "rule of decision" remains unclear, federal statutes do not run afoul of *Klein* as long as they refrain from "direct[ing] any particular findings of fact or applications of law, old or new, to fact." *See Robertson*, 503 U.S. at 438.

One "sure precept" emerges from this legal thicket: "a statute's use of the language of jurisdiction cannot operate as a talisman that *ipso facto* sweeps aside every

possible constitutional objection." *Nat'l Coalition to Save Our Mall*, 269 F.3d at 1096.
Yet because Congress may "impose new substantive rules on suits" that were not
"resolved on the merits when Congress acted," courts faced with *Klein* challenges must
tread lightly indeed. *See id.* at 1097.

Plaintiff argues that section 2(b) of the Gun Lake Act violates *Klein* because it
mandates dismissal and, as a consequence, dictates a rule of decision. *See* Pl.'s Mem. at
26-32. Plaintiff is correct that dismissal has the same practical effect as a judgment on
the merits—it compels a favorable disposition for defendants. There is a difference,
however, between a statute that dictates a particular decision on the merits, which *Klein*
prohibits, and a statute that altogether withdraws jurisdiction to reach the merits, which
*Klein* arguably does not preclude. *See Klein*, 80 U.S. at 146-47. The Gun Lake Act falls
within the latter category. The Act does not mandate a particular finding of fact or
application of law to fact. Instead, it withdraws this Court's jurisdiction to make any
substantive findings whatsoever. Our Circuit Court considered—and rejected—a
challenge to a similar statute, finding that a withdrawal of jurisdiction does not, by itself,
violate *Klein*. *See Nat'l Coalition to Save our Mall*, 269 F.3d at 1097 (stating, without
any detailed explanation, that the Act did not run afoul of *Klein*).

Congress's actions in this instance are more appropriately characterized as an
effort to circumscribe the Court's jurisdiction. This, Congress most assuredly can do.
The Constitution "gives to the inferior courts the capacity to take jurisdiction in the
enumerated cases, but it requires an act of Congress to confer it. . . . And the jurisdiction
having been conferred may, at the will of Congress, be taken away in whole or in part."

*Kline v. Burke Constr. Co.*, 260 U.S. 226, 234 (1922). Congress, as such, has plenary

power to "define and limit the jurisdiction of the inferior courts of the United States."

*Lauf v. E.G. Shinner & Co.*, 303 U.S. 323, 330 (1938). That is precisely what happened

here. Rather than dictate a particular outcome on the merits of plaintiff's case, Congress

has legislatively restricted the Court's jurisdiction. I find nothing constitutionally

repugnant in its exercise.

Plaintiff argues in the alternative that section 2(a) of the Act, which "reaffirm[s]"

the Secretary's May 2005 decision to take the Bradley Tract into trust, violates *Klein*

because it superimposes Congress's "own interpretation of the IRA without amending

it."[6] *See* Pl.'s Reply at 31. Were Congress to issue such a dictate, it would surely invade

the powers of the judicial branch. *See Cobell v. Norton*, 392 F.3d 461, 467 (D.C. Cir.

2004) (opining that a statute presents constitutional problems if, rather than "*changing*

the substantive law, [it] direct[s] the court how to *interpret* or apply pre-existing law").

The Court takes seriously, however, the invalidation of a Congressional action and

applies the "cardinal principle" that "as between two possible interpretations of a statute

by one of which it would be constitutional and by the other valid, [the Court's] plain duty

is to adopt that which will save the act." *NLRB v. Jones & Laughlin Steel Corp.*, 301

U.S. 1, 30 (1937); *see Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr.*

---

[6] The Court is reluctant to opine on this particular argument, which plaintiff presented, for the first time, in his Reply brief. As this Circuit has emphasized, "[t]he premise of our adversarial system is that . . . courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them. Considering an argument advanced for the first time in a reply brief . . . entails the risk of an improvident or ill-advised opinion on the legal issues tendered." *See McBride v. Merrell Dow & Pharm., Inc.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) (citations and internal quotation marks omitted).

*Trades Council*, 485 U.S. 568, 575 (1988) (when faced with dueling interpretations, one of which "would raise serious constitutional problems," courts must "construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress").

While plaintiff has proffered one potential reading of the statute, section 2(a) can more plausibly be read in a way that does not raise constitutional concerns, *i.e.*, as an affirmance of agency rulemaking. Nowhere does the Act instruct this, or any other, Court to ratify the Secretary's action. Nor, for that matter, does it compel "any particular findings of fact or applications of law." *See Robertson*, 503 U.S. at 438. Simply put, Congress lent its imprimatur to the Secretary's decision, but stopped short of requiring the judiciary to do the same. Endorsements of this nature are hardly unprecedented and Congress has, on at least one occasion, retroactively validated agency actions taken on behalf of Native American Tribes. *See James v. Hodel*, 696 F. Supp. 699, 701 (D.D.C. 1988), *aff'd sub nom. James v. Lujan*, 893 F.2d 1404 (D.C. Cir. 1990) (upholding a statute that "*ratifies and confirms* [the Wampanoag Tribal Counsel's] existence as an Indian tribe" (emphasis added)); *see also Swayne & Hoyt Ltd. v. United States*, 300 U.S. 297, 301-02 (1937) (Congress may use its plenary power to "ratify [agency] acts which it might have authorized, and give the force of law to official action unauthorized when taken" (citations omitted)).

Given that the Act neither mandates a particular interpretation of the substantive law nor creates an impermissible rule of decision, I reject plaintiff's separation of powers challenge and turn to plaintiff's remaining constitutional arguments.

### B.  First Amendment Right to Petition

Plaintiff next argues that section 2(b) of the Gun Lake Act burdens his First Amendment Right to Petition the government.  I disagree.  The First Amendment protects the right of individuals "to petition the Government for a redress of grievances." U.S. Const. amend. I.  The Right to Petition "is cut from the same cloth as the other guarantees of [the First] Amendment," and operates as "an assurance of a particular freedom of expression." *McDonald v. Smith*, 472 U.S. 479, 482 (1985).  Broad in scope, the right "extends to all departments of the Government," *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972), and guarantees, at a minimum, the right to seek redress from a federal decision-maker on the basis of a well-pleaded claim for relief, *see Borough of Duryea, Pennsylvania v. Guarnieri*, 131 S. Ct. 2488, 2494 (2011) ("[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government." (citation and internal quotation marks omitted)).  Laws that "significant[ly] impair[]" this right must, like all substantial constitutional burdens, survive "exacting scrutiny." *See Elrod v. Burns*, 427 U.S. 347, 362 (1976).

Not all burdens are "significant" and although the First Amendment protects the right to speak, it does not ensure the right to speak to *all* tribunals.  The distinction that emerges is narrow indeed.  Congress may not foreclose a plaintiff's right to petition *all* decision-makers, but it may withdraw access to *some* decision-makers.  *See Bill Johnson's Rests. Inc. v. NLRB*, 461 U.S. 731, 742 (1983) (invalidating a law that enjoined plaintiffs from filing "a meritorious suit" in state court).  *But see Am. Bus Ass'n v. Rogoff,*

15

649 F.3d 734, 741 (D.C. Cir. 2011) (finding that a law did not violate the First

Amendment because plaintiff could at least petition the agency for relief). Construing the

Right to Petition more broadly would have far-reaching implications. Were it read to

require access to all tribunals, the First Amendment would run headlong into another

tenet of federal governance—Congress's power to "define and limit the jurisdiction of the

inferior courts of the United States." *See Lauf*, 303 U.S. at 330. This, it does not do.

Plaintiff argues that the Gun Lake Act abridges his Right to Petition because it

"prohibits the filing of any other lawsuit that challenges the federal Defendant's actions

taking the Bradley Property into trust." *See* Pl.'s Mem. at 32. Defendants counter that

although the Act enjoins filings in federal court, it does not bar plaintiff from pursuing

other avenues of redress. *See* Mem. P. & A. Supp. United States' Opp'n Pl.'s Mot.

Summ. J. at 22 [Dkt. #85]; Def.-Intervenor's Opp'n Pl.'s Mot. Summ. J. at 11-12 [Dkt.

#86]. I agree. Plaintiff may not be able to bring his claim before this Court, but he

remains free to petition federal agencies, including the Department of the Interior, for

relief. Nothing in the Act can be read to restrict such advocacy and this Court sees no

reason to hold otherwise.

Plaintiff argues that this alternative is insufficient because any future complaints

filed with the agency, whose decision Congress has ratified, "will fall upon completely

deaf ears." Pl.'s Reply at 32. The Department of the Interior may, indeed, be reticent to

reverse its position. But nothing in the First Amendment entitles plaintiff to a favorable

disposition of his claim. *See Am. Bus Ass'n*, 649 F.3d at 741 (refusing to find that

Congressional interference with a plaintiff's potential remedies abridges the Right to

Petition).  The First Amendment safeguards only a citizen's right to *express* his grievance to a tribunal of competent jurisdiction.  Nowhere does it "guarantee[] a citizen's right to receive a government response to or official consideration of a petition for redress of grievances" and I decline to find such an assurance.  *See We the People Found. Inc. v. United States*, 485 F.3d 140, 141 (D.C. Cir. 2007).  Accordingly, because nothing in the Petition Clause bars Congress from restricting, as it has, the forum for judicial review, I find that the Gun Lake Act does not violate the First Amendment.

### C.  Fifth Amendment Due Process

Plaintiff next argues that section 2(b) of the Act violates his Fifth Amendment due process rights because it requires dismissal without allowing him to fully litigate his claim.  Pl.'s Mem. at 34-35.  Due process challenges are governed by a two-part inquiry: "whether [plaintiff] was deprived of a protected property interest and, if so, what process was his due."  *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).  A cause of action is considered a "protected property interest" only if a court has rendered "a final judgment" in that action.  *Jung v. Ass'n of Am. Med. Colls.*, 339 F. Supp. 2d 26, 43 (D.D.C. 2004), *aff'd*, 184 Fed. App'x 9 (D.C. Cir. 2006) ("Causes of actions only become actionable property interests upon the entry of final judgment.").

Plaintiff here argues that because the Supreme Court affirmed his standing to pursue this action, he has a property right protected by the Fifth Amendment.  *See* Pl.'s Mem. at 35.  Plaintiff is correct that his standing can no longer be challenged.  However, he presents no authority—nor am I aware of any—to support the proposition that the ability to bring a lawsuit constitutes the type of vested property right that the Fifth

Amendment due process clause protects.[7]  It would be bold, to say nothing of

unprecedented, to redraw the lines of property in such a fashion.  Thus, in the absence of

a cognizable property right, plaintiff's due process claim fails.

### D.  Bill of Attainder

Plaintiff's final constitutional attack to the Gun Lake Act lies in a Bill of

Attainder.  Article I, section 9 of the Constitution states that "[n]o Bill of Attainder . . .

shall be passed."  U.S. Const. art. 1 § 9, cl. 3.  This provision prohibits Congress from

enacting "a law that legislatively determines guilt and inflicts punishment upon an

identifiable individual without provision of the protections of a judicial trial."  *Nixon v.*

*Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977).  A law is thus a prohibited Bill of

Attainder if it punishes a specific person or entity.  *BellSouth Corp. v. FCC*, 144 F.3d 58,

62 (D.C. Cir. 1998).  To determine whether a statute imposes a punishment, courts

assess: "(1) whether the challenged statute falls within the historical meaning of

legislative punishment; (2) whether the statute . . . reasonably can be said to further

nonpunitive legislative purposes; and (3) whether the legislative record evinces a

congressional intent to punish."  *Foretich v. United States*, 351 F.3d 1198, 1218 (D.C.

---

[7] Even assuming, *arguendo*, that plaintiff has a property right in this action, he has arguably
received all the process he is due.  Congress has plenary power to grant, abridge, or revoke
Article III jurisdiction.  As the Supreme Court has held in welfare cases, which involve an
analogous Congressional power to confer, and revoke, a public benefit, "[t]he procedural
component of the Due Process Clause does not impose a constitutional limitation on the power
of Congress to make substantive changes in the law of entitlement to public benefits."  *See*
*Atkins v. Parker*, 472 U.S. 115, 129 (1985) (citation and internal quotation marks omitted).   In
such instances, "the legislative process provides all the *process* that is constitutionally due"
before Congress enacts a provision restricting litigants' judicial remedies. *See Am. Bus Ass'n*,
649 F.3d at 743.

Cir. 2003) (quoting *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 852 (1984)).

Although the Gun Lake Act applies specifically to suits involving the Bradley Tract, this alone is not problematic. *See Nat'l Coalition to Save Our Mall*, 269 F.3d at 1097 (finding a "[statute's] level of specificity to be unobjectionable"). Notwithstanding its specificity, the Gun Lake Act does not qualify as a Bill of Attainder for a second reason: it is not punitive. Jurisdiction stripping is simply not "punishment" in a historical sense—it does not impose a prison sentence, a fine, or any restriction that falls within the traditional "checklist of deprivations and disabilities" proscribed by the Constitution. *See Foretich*, 351 F.3d at 1218 ("This checklist includes sentences of death, bills of pains and penalties, and legislative bars to participation in specified employments or professions."). Nor was Congress's goal to disadvantage Mr. David Patchak. The Act's express purpose was to "provide certainty to the legal status of the land, on which the Tribe has begun gaming operations as a means of economic development for its community." S. Rep. No. 113-194 at 2 (2014). The Act may have incidentally affected plaintiff's use and enjoyment of his property. But incidental burdens do not a punishment make. As such, plaintiff's final constitutional challenge is no more meritorious than his prior attacks.

Having rejected each of plaintiff's challenges, I find no constitutional obstacle to the enforcement of the Gun Lake Act and must decline, for want of jurisdiction, to reach the merits of plaintiff's APA challenge.

**CONCLUSION**

Accordingly, for all of the foregoing reasons, Plaintiff's Unopposed Motion to File Consolidated Reply Brief and to Exceed Page Limits Specified by Local Rule is GRANTED, Intervenor-Defendant's Motion for Summary Judgment is GRANTED, and Plaintiff's Motion for Summary Judgment is DENIED.  Finally, Plaintiff's Motion to Strike the Administrative Record Supplement is DENIED.  This action is therefore DISMISSED.  An Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge